**ALAMO EXPRESS, INC., Petitioner,**

v.

**INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents.**

No. 81–4112.

United States Court of Appeals,
Fifth Circuit.

April 22, 1982.

James M. Doherty, Austin, Tex., for petitioner.

Colleen J. Bombardier, Atty., I. C. C., Washington, D. C., for respondents.

Leonard R. Kofkin, Chicago, Ill., for intervenor Yellow Freight System, Inc.

Before WISDOM, RANDALL and TATE, Circuit Judges.

TATE, Circuit Judge:

Yellow Freight System, Inc. ("Yellow"), applied to the Interstate Commerce Commission ("ICC") in 1980 for motor contract carrier authority to transport general commodities between all points in the United States, under continuing contracts with Yellow Forwarding Company ("Forwarding"). Three common carriers who operate almost exclusively in Texas, including the appellant, Alamo Express, Inc. ("Alamo") filed protests to the application. Despite

the protests, the ICC granted Yellow the requested authority. Yellow Freight System, Inc., Contract Carrier Application (Overland Park, KS), No. MC–149443 F (March 6, 1981). After exhausting administrative appeals to no avail, Alamo appeals to this court.

We find no merit to Alamo's contention that no substantial evidence supports the ICC's findings (a) that Yellow's proposed service qualifies as motor contract carriage and (b) that granting Yellow authority to conduct it will be consistent with the public interest and the national transportation policy; nor to its further contention that the Commission failed to make requisite subsidiary findings. Finally, in the light of the contentions as raised before the Commission and the factual findings by it that support the grant of contract carrier authority, we do not reach or decide Alamo's further contention that the ICC is in error in concluding that 49 U.S.C. § 10923(d)(1) *requires* grant of nationwide authority where contract carrier authority is granted. Finding that the ICC's decision is lawful, rational, and supported by substantial evidence, we therefore affirm.

*Overview*

These proceedings arise under the Motor Carrier Act of 1980. July 1, 1980, P.L. 96–296, 94 Stat. 793. Among its broad general purposes were to reduce unnecessary federal regulation and to remove regulatory inhibitions to market entry and carrier growth in the trucking industry, *id.* §§ 2, 3, as well as to promote competitive and efficient motor transportation services, *id.* § 4 [49 U.S.C. § 10101(a)(7) ].

The present litigation concerns an application by a motor *common* carrier [1] for authority to act as a motor *contract* carrier of property.[2] The applicant desires to provide contract carrier service to its wholly owned subsidiary, an ICC-licensed freight forwarder.[3] The application implicates several of the 1980 Act's provisions that specifically removed or lessened former restrictions upon the grant of motor contract service authority, as well as its general policy favoring broader grant of such authority. Among the specific provisions so implicated are: (a) The 1980 Act's amendment, § 10(b), which deleted from 49 U.S.C. § 10930(a)(1) the former prohibition against a person holding both a motor *common* carrier certificate and also a motor *contract* carrier permit; (b) the 1980 Act's modifications of § 10923(d)(1), which, with specific regard to a motor contract carrier of property, states that "the Commission may not require such carrier to limit its operations to carriage for a particular industry or within a particular geographic area;" and (c) a 1980 Act amendment adding a § 10923(b)(3)(B), which provides that, although (now as formerly) § 10923(b)(2) directs the Commission to consider the effect of granting the permit would have on the

---

1. A motor common carrier is:

a person holding itself out to the general public to provide motor vehicle transportation for compensation over regular or irregular routes, or both.

49 U.S.C. § 10102(12).

2. A motor contract carrier of property is:

a person providing motor vehicle transportation of property for compensation under continuing agreements with one or more persons—

(i) by assigning motor vehicles for a continuing period of time for the exclusive use of each such person; or

(ii) designed to meet the distinct needs of each such person.

49 U.S.C. § 10102(13)(B).

3. A freight forwarder is:

a person holding itself out to the general public (other than as an express, pipeline, rail, sleeping car, motor, or water carrier) to provide transportation of property for compensation and in the ordinary course of its business—

(A) assembles and consolidates, or provides for assembling and consolidating, shipments and performs or provides for break-bulk and distribution operations of the shipments;

(B) assumes responsibility for the transportation from the place of receipt to the place of destination; and

(C) uses for any part of the transportation a carrier subject to the jurisdiction of the Interstate Commerce Commission under specified provisions under [specified provisions of the Interstate Commerce Act].

49 U.S.C. § 10102(8).

transportation of protesting carriers, in deciding whether to *grant* the permit the Commission should consider that effect "*if* such grant would endanger or impair their operations to an extent contrary to the *public* interest" (emphasis supplied), and (d) the 1980 Act's amendment, § 10(d), to § 10766 (which formerly authorized freight forwarders only to contract only with motor *common* carriers) which expressly authorized freight forwarders to contract also with motor *contract* carriers, allowed the latter to provide transportation to the forwarder, and allowed the forwarder to use the services and instrumentalities of the contract carrier.

In this overview of the context in which the issues arise, it may be relevant to discuss the background of freight forwarder services, statutorily defined at 49 U.S.C. § 10102(13)(B) (quoted in footnote 3). As described by the United States Supreme Court, a freight forwarder "cannot perform the physical transportation except in its terminal areas. [Citation.] It assembles shipments, consolidates them, ships them by common carrier (usually a railroad), receives them and separates and distributes them to individual consignees.... It is obvious that there is a good deal of overlap between the work of the freight forwarders and that of the other common carriers." *American Trucking Associations, Inc. v. Atchison, Topeka & Santa Fe Railway Company*, 387 U.S. 397, 418–19, 87 S.Ct. 1608, 1620, 18 L.Ed.2d 847 (1967). See also description of freight forwarder services at *Mercury Motor Express, Inc. v. Brinke*, 475 F.2d 1086, 1088–89 (5th Cir. 1973).

By way of background, because the railroad common carriers less-than-carload tariff rates were regarded by small shippers as unduly expensive, initially a service was provided by "freight forwarders" to assemble such small shipments together for shippers and to obtain the benefit of the full-carload rates in delivering the goods to the various destinations. *See Interstate Commerce Commission v. Delaware, Lackawanna & Western Railroad Company*, 220 U.S. 235, 31 S.Ct. 392, 55 L.Ed. 448 (1911); C. A. Miller, Interstate Commerce Law and Procedure 318–321 (1939). Initially, freight forwarders themselves were not regulated under the provisions of the Interstate Commerce Act. However, because certain abuses by way of preferential and non-tariff authorized rates resulted from carrier-dominated freight forwarders, see *Freight Forwarding Investigation*, 229 I.C.C. 201 (1938), the Act was amended in 1942 to grant the Commission authority to regulate the rates, practices, and services provided by freight forwarders. Part IV of Interstate Commerce Act, as added May 16, 1942, c. 318, 56 Stat. 284 (former 49 U.S.C. §§ 1001 et seq.]. The legislation provided, inter alia, that freight forwarder permits could not authorize the holder to conduct direct railroad, water, or motor-carrier operations, except insofar as incidental to service by transfer, collection, or delivery services within a terminal area. Former 49 U.S.C. § 1010(h), now 49 U.S.C. § 10930(b)(2). On the other hand, the Commission was prohibited from issuing a forwarders permit to any common carrier, although (somewhat illogically, from a layman's point of view) the Commission was also prohibited from *denying* such a permit to a forwarder because it was controlled by or under the common control of such a carrier. Former 49 U.S.C. § 1010(c), now 49 U.S.C. §§ 10930(b)(1), 10923(b)(3)(A). Likewise, a freight forwarder was prohibited from acquiring control of a rail, motor, or water carrier regulated by the Act. Former 49 U.S.C. § 1011(a); now 49 U.S.C. § 11323(a).

A thrust of the protestant Alamo's petition for review is that, under the circumstances before us, some of the policies underlying limitations on common carrier-freight forwarder relationships are subverted by the grant to Yellow, a common carrier, of authority for it to act as contract carrier for Forwarding, Yellow's wholly-owned subsidiary, a freight forwarder. Alamo also argues that, by granting Yellow authority to act as nationwide contract carrier for its subsidiary Forwarding, the latter has in practical effect been awarded authority to conduct nationwide motor common carrier services.

These arguments, largely based upon jurisprudence arising under the statutory enactments prior to the 1980 revision, are not unforceful. Nevertheless, we are unable to hold that by granting Yellow's application the ICC exceeded its intended post-1980 authority. In reaching this conclusion, we take into consideration the 1980 changes now permitting motor common carriers also to hold a motor contract carrier permit and now permitting freight forwarders to contract with motor contract carriers for the performance of transportation services, as well as the other 1980 statutory changes favoring the broad grant of authority to motor contract carriers of property. For reasons more particularly set forth below, we find that under the 1980 Act the Commission properly applied the statutory criteria in its grant of the motor contract carrier authority to Yellow and that its findings are supported by substantial evidence.

*Standard of Review*

■ Preliminarily, we observe: with regard to ICC orders granting authority or permits, judicial review is limited in scope. The court may not disturb the order unless it finds that the Commission's substantive findings and conclusions were arbitrary and capricious, an abuse of discretion, not in accordance with law, or not supported by substantial evidence: 5 U.S.C. § 706(2); *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974); *Refrigerated Transport Co., Inc. v. I. C. C.*, 616 F.2d 748, 751 (5th Cir. 1980).

"Under the 'arbitrary and capricious' standard the scope of review is a narrow one. A reviewing court must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.... The court is not empowered to substitute its judgment for that of the agency'.... The agency must articulate a 'rational connection between the facts found and the choice made' ... [but] we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transportation,*

*supra*, 419 U.S. at 285, 95 S.Ct. at 442. In the context of judicial review of an administrative agency decision, substantial evidence is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'." *Consolo v. Federal Maritime Commission*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966); quoted and applied by *Refrigerated Transport, supra*, 616 F.2d at 751, in the review of an ICC grant of a carrier certificate.

I. *The Factual Background*

Yellow, the applicant, is presently operating as a motor *common* carrier of property over regular and irregular routes. The 1980 application was Yellow's first request for authority to operate as a motor *contract* carrier of property. Yellow wishes to provide contract carrier service to Forwarding, which is an ICC-licensed nationwide (with minor exception) freight forwarder. Forwarding is a wholly-owned subsidiary of Yellow.

The ICC considered Yellow's application under its modified procedure, which permits those supporting and those opposing an application to submit written verified statements instead of testifying orally where the material facts are not in dispute. *See* 49 C.F.R. §§ 1100.43 *et seq.* Yellow, supported by Forwarding, asserted that Forwarding had a "distinct need" for Yellow's proposed service, because Yellow, unlike any common carrier, could provide single-line service to handle Forwarding's traffic between all points served by it. This would result, according to Yellow and Forwarding, in reduced transit time and improved tracing of mishandled commodities. Furthermore, Yellow was said to be able to provide Forwarding with other consolidation, distribution, and line haul services specially tailored to meet Forwarding's needs.

In opposition to Yellow's application, Alamo argued that Yellow had failed to show that its proposed service would "serve a useful public purpose, responsive to a public need demand or need," as required for *common* carrier applicants (but not for *contract* carrier applicants) by U.S.C.

§ 10922(b)(1)(B). Alamo further argued that the granting of the requested authority would substantially harm Alamo by causing a loss in revenue and fuel efficiency.[4] Alamo asked the ICC therefore to deny Yellow's application in its entirety.

An ICC review board, rejecting the protests of Alamo and the two other carriers, granted Yellow the requesting nationwide contract carrier authority. The review board noted that the provision of the Motor Carrier Act of 1980 that specifically allows freight forwarders to use the services of contract carriers provides only that "the parties to the contract must establish reasonable conditions and compensation that are consistent with the transportation policy of [49 U.S.C. § 10101, quoted at note 7 *infra*] and do not unreasonably discriminate against a party or another freight forwarder", 49 U.S.C. § 10766(b), and thus that the common carrier requirements relied upon by Alamo were inapposite. The review board then agreed with Yellow and Forwarding that the granting of the permit would serve the public interest and the national transportation policy. The board found that Alamo had failed to show that its operations would be harmed to a material extent, because Alamo's statistical evidence that purported to show harm was not reliable. In the alternative, the board reasoned that, even if Alamo's statistics were considered reliable, they showed only that Alamo would lose a mere two percent of its interstate revenues. Accordingly, the board granted Yellow the requested authority.

The board's decision was administratively affirmed. Of the three protesting carriers only Alamo has sought review by this court. In addition to the issues it raised before the ICC, Alamo contends 1) that the ICC's conclusion that Yellow's proposed service constitutes contract carriage is not supported by substantial evidence; 2) that the ICC's finding that Yellow's proposed service will be consistent with the public interest and the national transportation policy is not supported by substantial evidence; 3) that the ICC failed to make certain subsidiary factual findings, as allegedly required by statute; and 4) that the ICC erred by concluding that it could not limit the requested authority to less than national scope.

II. *Did the ICC Properly Conclude That Yellow's Proposed Service Constitutes "Contract Carriage"?*

Alamo makes the threshold argument that the ICC erred by even considering the merits of Yellow's application, because the proposed service does not constitute "contract carriage" within the meaning of 49 U.S.C. § 10102(13)(B) (quoted at note 2, *supra*). We disagree.

The ICC found that Yellow's proposed service qualifies as contract carriage under 49 U.S.C. § 10102(13)(B)(ii), because the proposed service is "designed to meet the distinct needs" of Forwarding. Specifically, the ICC noted that Yellow planned to provide Forwarding, the shipper, with "consolidation, distribution, and line haul services which are designed to meet shipper's distinct needs."[5]

Alamo contends that this finding is not supported by sufficient subsidiary factual findings or by substantial evidence. Alamo

---

4. In addition, Alamo raised certain other contentions that apparently have been abandoned for purposes of the present appeal.

5. The ICC thus accepted the evidence submitted by Yellow on the "distinct need" issue. A Yellow official averred in his verified statement:

The applicant proposes to serve Yellow in a manner designed to meet its distinctive need, namely, the applicant would perform terminal pickup and delivery service; transportation to consolidation points, consolidation of individual LTL shipments into truckloads, li-

nehaul transportation to distribution points; breakbulk for distribution; and delivery, all in accordance with the instructions and special needs of the forwarder. Comprehensive services of this type are not available now on the scale proposed by the applicant. The forwarder has been required to utilize underlying transportation sometimes by railroad and sometimes by motor carrier, but seldom in single-line service by either mode. In other words, the service proposed under this contract carrier authority will be entirely single-line service.

concedes that Yellow did present evidence on this issue, but it contends that the evidence is not sufficiently specific and is not indicative of "distinct need."

■ We find that the ICC's rationale is sufficiently clear to enable the parties and the court to understand it, and that the ICC's conclusion is supported by substantial evidence. Accordingly, we do not disturb the ICC's decision on this point. *See Central Freight Lines, Inc. v. United States*, 669 F.2d 1063, at 1073–74 (1982); 5 U.S.C. § 706. The ICC could reasonably rely on Yellow's evidence in support of a finding of "distinct need." The ICC could reasonably find from Alamo's evidence that Yellow could provide Forwarding with needed services that Alamo, a carrier conducting operations only in Texas, and other common carriers are unable to provide, such as nationwide single-line service with centralized responsibility for claims, and consolidation, break-bulk, and delivery services. Similar factors have been viewed as a "distinct need" justifying issuance of a contract carrier permit. *See, e.g., Continental Contract Carrier Corp. v. United States*, 311 F.Supp. 390, 394–95 (D.C.Cal.1970); Mid-West Truck Lines, Ltd., Extension—Penbina, N. Dak., 113 M.C.C. 329, 335–36 (1971). We are unable to say that the ICC acted arbitrarily, capriciously, or without the support of substantial evidence in concluding that Yellow's proposed service would satisfy "distinct needs" of Forwarding.

III. *Did the ICC Properly Conclude That Yellow's Proposed Service Would Be Consistent with the Public Interest and the National Transportation Policy?*

After concluding that Yellow's proposed service constituted contract carriage, the ICC proceeded to consider the merits of Yellow's application. Pursuant to 49 U.S.C. § 10923(a), the ICC was obliged to issue the requested permit if it found 1) that the applicant was fit, willing, and able to provide the service to be authorized by the permit, and 2) that the service to be provided under the permit would be consistent with the public interest and the national transportation policy. In making this determination, the ICC was obliged, as provided by 49 U.S.C. § 10923(b)(3), to consider:

(A) the nature of the transportation proposed to be provided;

(B) the effect that granting the permit would have on the protesting carriers if such grant would endanger or impair their operations to an extent contrary to the public interest;

(C) the effect that denying the permit would have on the person applying for the permit, its shippers, or both; and

(D) the changing character of the requirements of those shippers.

■ Alamo concedes that Yellow is fit, willing, and able to provide the proposed service. The issue is whether the ICC properly found that the proposed service would be consistent with the public interest and the national transportation policy. The ICC stated that, upon consideration of the § 10923(b)(3) criteria, it was convinced that the application should be granted, because Forwarding "needs the services of a carrier capable of providing consolidation, line haul, and distribution service on its traffic and applicant is willing to offer that service."

With regard to the Commission's findings relating to the statutory criteria, Alamo's only specific complaint concerns the ICC's findings relative to the prospective (non)impairment of Alamo's operations, see § 10923(b)(3)(B), quoted *supra*. With respect to the criteria enunciated by this subsection B, the ICC did not feel that the evidence offered by Alamo and the other protestants warranted denial of the application. By its express terms, § 10923(b)(3)(B) requires the ICC to consider adverse effects on protesting carriers only if the granting of the requested permit "would endanger or impair [the protestants'] operations to an extent contrary to the public interest." The burden of proving adverse effects is on a protestant, and vague and speculative assertions of harm could not be sufficient. *See* Liberty Trucking Co., Extension—General Commodities, 130 M.C.C. 243, 246–47

(1978), *aff'd*, 131 M.C.C. 573 (1979), *aff'd sub nom. Assure Competitive Transportation, Inc. v. United States*, 629 F.2d 467, 476–79 (7th Cir. 1980), *cert. denied*, 449 U.S. 1124, 101 S.Ct. 941, 67 L.Ed.2d 110 (1981).

Alamo argued below that the granting of the requested authority would cause it to lose greater than 10.7% of its total revenues. This was based on the assumption that, upon commencement of Yellow's proposed service, Alamo would lose *all* of its business with Yellow. However, Alamo's own evidence indicated that Yellow would continue to rely on Alamo, at least as a delivering carrier. Therefore, the ICC found that Alamo's evidence did not reliably indicate Yellow's proposed contract carrier service would harm Alamo, and that, alternatively, even if the evidence was deemed reliable, it only showed that Alamo would lose about 2% of its interstate revenues, an amount apparently considered immaterial.[6]

■ It is evident that the ICC considered Alamo's evidence and found it unpersuasive. It is not the function of this court to reweigh the evidence. "[T]he evaluation of the credibility or weight to be accorded to these [evidentiary] statements is for the Commission, not this court." *East Texas*

*Motor Freight Lines v. United States*, 593 F.2d 691, 697 n.11 (5th Cir. 1979). The ICC rationally concluded that Alamo had failed to prove significant harm.

Accordingly, we do not disturb the ICC's conclusion that the granting of the requested permit would be consistent with the public interest and the national transportation policy.

## IV. Did the ICC Improperly Fail to Make Subsidiary Factual Findings as to Whether Yellow's Proposed Service Would Be Consistent with the National Transportation Policy?

As noted previously, 49 U.S.C. § 10923 obliges the ICC to consider whether a contract carrier applicant's proposed service would be consistent with the public interest and the national transportation policy. The national transportation policy is set forth at 49 U.S.C. § 10101, which provides, *inter alia*, that it is the policy of the United States government to promote competitive and efficient transportation services in order to meet the needs of shippers, to maintain service to small communities, and to enable efficient carriers to earn adequate profits and pay fair wages.[7] Alamo asserts that the ICC failed to make subsidiary fac-

---

**6.** Alamo's evidence consisted of a comparison of August 1980 and September 1980 revenue obtained by Alamo from interchange with Yellow. In August 1980, but not in September 1980, Yellow was providing Forwarding with contract carrier service to and from Brownsville, Texas, under a temporary permit. Alamo's evidence showed that in August 1980, Yellow tendered to Alamo shipments that generated $94,518 in revenue for Alamo, and that Alamo tendered to Yellow shipments generating $27,132 in Alamo revenue, for total Alamo interchange revenue of $121,650. In September 1980, Yellow-to-Alamo transactions provided Alamo with $88,043 in revenue, and Alamo-to-Yellow shipments generated Alamo $46,103, for a total of $134,146. Thus, although Alamo garnered more total revenue from Yellow in the month after Yellow lost its temporary authority, Yellow-to-Alamo interchange actually *decreased* in this month. This indicates that Yellow continued to rely on Alamo as a delivering carrier even when Yellow had temporary contract authority with Forwarding. More importantly, as the ICC noted, these figures can hardly be viewed as compelling evidence that the granting of the requested authority will cause

Alamo to lose *all* of its revenue from interchange with Yellow, as Alamo contends, or even a substantial part of it.

**7.** 49 U.S.C. § 10101 provides in full:

(a) Except where policy has an impact on rail carriers, in which case the principles of section 10101a of this title shall govern, to ensure the development, coordination, and preservation of a transportation system that meets the transportation needs of the United States, including the United States Postal Service and national defense, it is the policy of the United States Government to provide for the impartial regulation of the modes of transportation subject to this subtitle, and in regulating those modes—

(1) to recognize and preserve the inherent advantage of each mode of transportation;

(2) to promote safe, adequate, economical, and efficient transportation;

(3) to encourage sound economic conditions in transportation, including sound economic conditions among carriers;

(4) to encourage the establishment and maintenance of reasonable rates for trans-

tual findings addressing Alamo's evidence that the granting of the requested permit would cause: 1) impairment of Alamo's service to small Texas communities, 2) impairment of Alamo's ability to earn profits and pay fair wages, and 3) adverse impact on the fuel efficiency of Alamo's operations.

■ The national transportation policy must guide the ICC in all its decisions. However, the ICC need not explicitly discuss in its decision each factor enumerated in § 10101. All that is necessary is that the essential basis of the ICC's rationale be clear enough so that a court can satisfy itself that the ICC has performed its function. *Luckenbach S.S. Co., Inc. v. United States*, 122 F.Supp. 824, 827–28 (S.D.N.Y.), aff'd mem., 347 U.S. 984, 74 S.Ct. 850, 98 L.Ed. 1120 (1954).

■ In the present case, the ICC's opinion is sufficiently clear for us to satisfy ourselves that the ICC reached its decision rationally and with the support of substantial evidence. It seems apparent that the ICC found that Yellow's proposed service would be consistent with the national transportation policy because it would "meet the needs" of the shipper, Forwarding, and because, due to the unreliability of Alamo's evidence, there was no proof that any of the alleged harms would result. We therefore cannot agree with Alamo that the ICC's decision lacks necessary subsidiary factual findings.

## V. *Could the ICC Limit the Territorial Scope of Yellow's Permit?*

Before the ICC, Alamo asked only that Yellow's application be denied in its entire-

portation without unreasonable discrimination or unfair or destructive competitive practices;

(5) to cooperate with each State and the officials of each State on transportation matters;

(6) to encourage fair wages and working conditions in the transportation industry; and

(7) with respect to transportation of property by motor carrier, to promote competitive and efficient transportation services in order to (A) meet the needs of shippers, receivers, and consumers; (B) allow a variety of quality and price options to meet changing market demands and the diverse requirements of the

ty. Alamo now asks this court to hold that the ICC should have denied Yellow's application with respect to operations to and from Texas (Alamo's area of operations), regardless of whether approval of the application with respect to the other 49 states was warranted. Even though Alamo failed to raise this contention below, it now argues that the ICC "refused to consider" the possibility of excluding Texas from the scope of Yellow's permit, due to a misinterpretation of 49 U.S.C. § 10923(d)(1), as amended in 1980, which states:

The Commission may prescribe necessary conditions under which a contract carrier or freight forwarder provides transportation or service, *except that in the case of a motor contract carrier of property, the Commission may not require such carrier to limit its operations to carriage for a particular industry or within a particular geographic area.* The Commission may prescribe the conditions when the permit is issued and at *any time* thereafter.

(Emphasis added.)

Notwithstanding § 10923(d)(1), Alamo contends that the ICC had the power to limit the territorial scope of Yellow's permit pursuant to 49 U.S.C. § 10923(b)(1), which provides in pertinent part:

A person must file an application with the Commission for a permit to provide transportation as a contract carrier or to provide service as a freight forwarder. The Commission may approve *any part* of the application or deny the application.

shipping public; (C) allow the most productive use of equipment and energy resources; (D) enable efficient and well-managed carriers to earn adequate profits, attract capital, and maintain fair wages and working conditions; (E) provide and maintain service to small communities and small shippers; (F) improve and maintain a sound, safe, and competitive privately-owned motor carrier system; (G) promote greater participation by minorities in the motor carrier system; and (H) promote intermodal transportation.

(b) This subtitle shall be administered and enforced to carry out the policy of this section.

(Emphasis added.) We pretermit the question whether the ICC has the power to limit the territorial scope of authority of a motor contract carrier of property, because, in light of the ICC's factual findings, its grant of the contract carrier authority was not essentially based upon its construction of § 10923(d)(1). Entirely independently of this statutory provision, the Commission found that the application met the statutory provisions for issuance of the permit as contract carrier.

It is true that, in its opinion in the present case, the ICC did allude to its view, first enunciated in Ex Parte No. 55 (Sub-No. 43A), Acceptable Forms of Requests for Operating Authority (Motor Carriers and Brokers of Property), 45 Fed.Reg. 45545, 45549 (1980), "that Congress intended contract carriers to be granted authority between all points in the United States." [8] However, it merely did so as "[a]n *additional* reason" for rejecting the protestants' argument that insufficient specific information had been presented with respect to each sought origin and destination.

■ With specific respect to motor contract carriers of property, § 10923(d)(1) provides that the Commission may not require such carrier to limit its operations "within a particular geographic area." At the least, the provision evidences a statutory policy disfavoring geographic limitations to permits issued to motor contract carriers of property. In conjunction with the other provisions of the Motor Carrier Act of 1980 facilitating the issuance of motor contract carrier of property permits and broadening their permitted uses—including the express authorization that freight forwarders be permitted to contract with such carriers—the application of the provision in accordance with this statutory policy would indicate that the issuance of the contract carrier permit (where (as here) the statutory criteria are met for its issuance) should not be subject to geographic limitations that, in the case of a contract to serve a forwarder, would limit the performance of contractual transportation services by the contractor-carrier to be less than coextensive with the territorial authority of the forwarder contractee.

■ Thus—having found that the applicant Yellow met the statutory criteria for issuance to it of a permit as a motor contract carrier of property for it to enter into a contractual relationship to provide transportation services for Forwarding—we do not find merit to the protestant Alamo's underlying argument that the evidence was insufficient to grant the territorial authority because insufficient data from representative points of origin and destination were presented. The application included nine such allegedly representative points from the east coast to the west coast, including one from Texas. As stated in *Refrigerated Transport Co., Inc. v. I. C. C.*, 616 F.2d 748, 754 (5th Cir. 1980): "When an applicant . . . seeks authority to provide transportation to many localities in a large geographic area, it is not necessary that he demonstrate a . . . necessity with respect to each point for which he seeks authority. [Citations omitted.] '[T]here is no requirement that data on need and benefit be gathered for every village and hamlet in the area of proposed operations before a certificate of such encompassing scope may be awarded.' [Citation omitted.]" We are unable to hold that the Commission erred in finding that the relied-upon representative points of origin and destination provided sufficient data, insofar (and if) requisite to the grant of a motor contract carrier permit that per-

8. Thus, the ICC interprets § 10923(d)(1) as mandating an "'all or nothing" approach—that is, if an applicant desires a nationwide permit but the ICC determines that the granting of such would destroy a competitor operating in a discrete geographic area, the ICC believes that its only options are: 1) to grant the nationwide permit, despite the resulting harm to the competitor, or 2) to deny the application in its entirety, even if the applicant's proposed service outside the competitor's discrete territory would not harm anyone and would be greatly beneficial to the public interest.

We do not reach and do not express any view either pro or con, as to the Commission's view that the statutory provision *mandates* no territorial restriction whatsoever in the issuance of permits to motor contract carriers of property.

mits the applicant to serve a territorial area that is coextensive with the territorial area authorized to be served by the shipper-forwarder for whom it seeks contract carrier authority to serve. As earlier noted, even assuming (see note 8) that the Commission had authority to limit the contract carrier's operations so as to exclude Texas (the only area served by the protestant Alamo), the evidence reasonably accepted by the ICC does not show any reason to do so on account of the alleged harmful effects to Alamo, the only basis sought for such limitation.

Yellow requested nationwide contract carrier authority and established that it met the statutory criteria for such. Alamo failed to establish any reason why Yellow should be limited to less. Under these circumstances, the order properly granted issuance to Yellow of a contract carrier permit, independently of whether § 10923(d)(1) mandates issuance of a nationwide permit.

*Conclusion*

For the foregoing reasons, the order of the ICC is AFFIRMED. The stay order previously granted by this court is RESCINDED.

ICC ORDER AFFIRMED; STAY ORDER RESCINDED.