WHEATON VAN LINES, INC., et
al., Petitioners,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents.

No. 81–2995.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 3, 1984.

Decided April 6, 1984.

As Corrected April 10, 1984.

Alan F. Wohlstetter, Denning & Wohlst-
etter, Washington, D.C., for petitioners.

Lawrence H. Schecker, I.C.C., Dept. of
Justice, Antitrust Div., Washington, D.C.,
for respondents.

Before WOOD, ESCHBACH, and POS-
NER, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit
Judge.

Four competitors[1] of A. Arnold & Son
Transfer & Storage Company, Inc., all mo-

---

1. The petitioning competitors are Wheaton Van      Lines, Inc., Global Van Lines, Inc., Aero May-

tor common carriers of household goods, appeal the decision of the Interstate Commerce Commission awarding Arnold contract carrier authority, as distinct from ordinary common carrier authority, to transport household goods for three corporate shippers.[2] The competitive spark which ignites this litigation is that with contract carrier authority, Arnold can offer a discount rate to its three customers, whereas without that authority the four competing petitioners are bound to render service on equal terms according to their published tariffs to all customers under substantially similar circumstances. Petitioners argue that the grant to Arnold of contract carrier authority should be vacated as neither rational nor supported by the substantial evidence because the contract service proposed by Arnold in each instance fails to meet the "distinct needs" test for motor contract carrier authority.[3] We therefore must examine the statutory differences between *motor common carriers*[4] and *motor contract carriers* as applied to the household goods moving needs of the three corporate customers.

## I.

Under the provisions of the Motor Carrier Act of 1935,[5] motor carriers are required to seek a license from the Commission to operate interstate. In *United States v. Drum*, 368 U.S. 370, 374–75, 82 S.Ct. 408,

410–411, 7 L.Ed.2d 360 (1962), the Supreme Court noted that the underlying principle of the federal regulations was to assure an economically healthy system of interstate motor transportation. That purpose was seen to justify administrative surveillance of motor carriers' rates and service, and control over motor carriers' entry into the contract carrier business. *Id.* The enactment of the Motor Carrier Act of 1980,[6] however, along with other legislation, evidenced a relaxation of federal control with the intent to foster carrier growth, competition, and efficiency. *Alamo Express, Inc. v. ICC*, 673 F.2d 852, 854 (5th Cir.1982) (citing a provision of the Motor Carrier Act of 1980, since revised by the Bus Regulatory Reform Act of 1982, now found at 49 U.S.C.A. § 10101(a)(2) (West Supp.1983)). The enactment of the Household Goods Transportation Act of 1980[7] followed, the legislative history of which makes clear the intent to introduce into the moving industry the same degree of competition being fostered in the rest of the interstate trucking business.[8]

This new legislation did not change the requirement that a motor contract carrier of property must either dedicate its equipment to particular shipping customers or provide motor carrier service, in the words of the statute, "designed to meet the distinct needs" of its shipping customers. 49

---

flower Transit Company, Inc., and Allied Van Lines, Inc.

**2.** The corporate shippers are Humana, Inc., Brown & Williamson Tobacco Corporation, and Celanese Plastics & Specialty Company.

**3.** The subsections of section 10102 were renumbered by the Bus Regulatory Reform Act of 1982, Pub.L. No. 97–261, 96 Stat. 1107 (1982). Subsection (14)(B), formerly subsection (13)(B), provides:

"motor contract carrier" means—* * *
(B) a person providing motor vehicle transportation of property for compensation under continuing agreements with one or more persons—
(i) by assigning motor vehicles for a continuing period of time for the exclusive use of each such person; or
(ii) designed to meet the distinct needs of each such person.
49 U.S.C.A. § 10102(14)(B) (West Supp.1983).

**4.** Section 10102(13), formerly § 10102(12), provides:

"motor common carrier" means a person holding itself out to the general public to provide motor vehicle transportation for compensation over regular or irregular routes, or both.
49 U.S.C.A. § 10102(13) (West Supp.1983).

**5.** Pub.L. No. 74–255, 49 Stat. 543 (1935).

**6.** Pub.L. No. 96–296, 94 Stat. 793 (1980).

**7.** Pub.L. No. 96–454, 94 Stat. 2011 (1980).

**8.** 126 Cong.Rec.S 13825 (Sept. 30, 1980) (Remarks of Senator Cannon); *see also* H.R.Rep. No. 96–1372, 96th Cong., 2d Sess. 5, *reprinted in* 1980 U.S.Code Cong. & Ad.News 4271, 4275.

U.S.C. § 10102(14)(B). The latter concept, not the former, is at issue in this case. However, the service to be provided also must be consistent with the public interest and transportation policy. 49 U.S.C. § 10923(a)(2) (Supp. V 1981).

These recent amendments to the Interstate Commerce Act adopted a transportation policy which was intended, among other things, to promote competitive and efficient motor carrier transportation of property in an effort to meet the diverse requirements of the shipping public interest. These changes show an intent to open up the motor carrier business and to minimize Commission interference with competition.[9]

Against that background of recent developments in motor carrier transportation law, we examine the particular circumstances of this case.

## II.

In 1983, Arnold filed an application with the Commission for authority to offer contract carrier service to three corporate customers, Humana, Brown & Williamson, and Celanese, which Arnold stated would be "full moving service tailored to meet the respective needs of these companies." In more detail the service was described as follows:

The service that we are proposing is a contract service in which we will guarantee that the shippers will receive the highest caliber of service from our company based on timed pick-ups, timed deliveries, [and] continuity of crew .... We shall not have a particular dedication of equipment to these particular shippers because we shall use equipment from our regular fleet on an intermittent basis serving these shippers, but, the caliber of service that we offer will be different than that which we can presently offer as a common carrier.

Arnold explained the particular benefits of the proposed contract service as enabling it to offer the three shippers rates approximately ten percent lower than its common carrier rates. In return the shippers would give Arnold commitments for certain amounts of traffic, which would allow Arnold to allocate its crews and equipment to better service each account. Arnold further claimed that the resulting centralized handling of the accounts would benefit corporate employees whose household goods would be shipped because the dispatcher would be familiar with their particular needs and on-time and tracing services could be provided. Also, Arnold claimed that although a specific transportation unit would not be assigned to the exclusive use of a particular shipper, the contract service nevertheless would be provided by assigned vehicles and drivers. That would enable Arnold, it explained, to assign crews and equipment, familiar to

---

**9.** The following changes were made under the Motor Carrier Act of 1980:

In deciding on a permit application, the Commission shall consider the effect on protesting carriers only if the proposed grant "would endanger or impair their operations to an extent contrary to the public interest." 49 U.S.C. § 10923(b)(3)(B) (Supp. V 1981).

The number of shipping customers of the carrier applicant is no longer a consideration, *see* 49 U.S.C.A. § 10923(b)(2) (West Supp.1983), and motor contract carriers in particular are no longer restricted as before to serving a "limited number of persons," as provided in 49 U.S.C.A. § 10102(14) (West Supp.1983). *See* H.R.Rep. No. 96–1069, 96th Cong., 2d Sess. 22, *reprinted in* 1980 U.S.Code Cong. & Ad.News 2283, 2304.

Nor are motor contract carriers limited in the type of shipping customers they may serve. Freight forwarders are no longer excluded as contract customers. 49 U.S.C.A. § 10749(b) (West Supp.1983) and 49 U.S.C. § 10766(b) (Supp. V 1981).

A motor carrier now may operate both as a common carrier and as a contract carrier. *See* 49 U.S.C. § 10930(a) (Supp. V 1981).

A motor contract carrier can no longer be limited by the Commission to a particular industry or geographic area. 49 U.S.C. § 10923(d)(1) (Supp. V 1981).

The standing of other carriers to protest the grant of an application as a motor contract carrier now is more restricted. 49 U.S.C. § 10923(b)(4) (Supp. V 1981). That change was considered recently by this court in an opinion by Judge Eschbach. *See Aero Mayflower Transit Co. v. ICC,* 699 F.2d 938 (7th Cir.1983).

A competing common carrier now may follow a procedure to police and challenge a contract carrier's operations as no longer fulfilling the requirements of a contract carrier. 49 U.S.C.A. § 10925(e) (West Supp.1983). *See infra* note 10.

the customer, which would provide the required service from start to finish. Arnold also claimed that this would enable shipments to be aggregated for faster service.

Witnesses representing the corporate shippers testified by affidavit in support of Arnold's application. All three stated that their companies' specialized service needs include full moving services for light weight moves over short distances with little notice. Humana is a proprietary health care corporation owning and operating 90 hospitals in the United States and others in foreign countries. In 1980, Humana had 387 moves for administrative personnel and over 300 moves for doctors. It proposed to tender all of its moves to Arnold if contract carrier authority were granted. Brown & Williamson had about 800 employees in its corporate office and 1,000 in the sales field with sales offices in 28 cities. The company requires service for about 250 household moves a year, and planned to use Arnold's contract carrier service for fifty to sixty percent of its moves. Celanese is a manufacturer with plants in six states. In 1980, it had 39 moves; it proposed to use Arnold's contract service "whenever possible."

The Commission, in spite of petitioners' objections that Arnold's proposal failed to meet the "distinct needs" test and was no more than a guise to provide a rate discount, approved Arnold's proposed contract carrier service for the three shippers. A Commission Review Board found that the proposed service would permit lower rates, guaranteed pick-up and delivery times, and other special services not provided in common carrier tariffs. The Board also found that the contract carrier authority would not impair petitioners' operations nor be contrary to the public interest. The Commission denied petitioners' appeal, noting that the findings of the Review Board were in accordance with the evidence and applicable law. The petitioners label these findings as arbitrary, capricious, and unsupported by substantial evidence.

The Commission's action is somewhat anemic and facially open to petitioners' questions and criticism. Petitioners argue that the favored shippers have failed to show that each has need for a different, select, or more specialized household goods shipping service than ordinarily available from a common carrier. Further, petitioners argue that Arnold has failed to prove that its service would be better tailored to meet any special requirements that the shippers claim to have.

### III.

We approach this case conscious of our narrow scope of review. *Alamo Express, Inc. v. ICC,* 673 F.2d 852, 856 (5th Cir. 1982); *Benmar Transport & Leasing Corp. v. ICC,* 623 F.2d 740, 743–44 (2d Cir.1980). In determining whether the Commission has properly interpreted and followed the Act in approving Arnold's proposal as meeting the "distinct needs" test, we must consider whether the Commission's findings are supported by substantial evidence, in accordance with law, and neither arbitrary nor capricious. 5 U.S.C. § 706(2)(A) & (E) (1982). Beyond that, this court should not substitute its judgment for the Commission's.

■ We are not prepared to hold that the Commission misconstrued "distinct needs." The term is not defined by the statute. Possibly Congress could have clarified what it meant by "distinct needs." Perhaps, however, it would be like trying to further define "reasonable doubt," only to find that there is not much more than can be said without distorting the concept. The Commission's interpretation is entitled to great deference by this court, *see Zuber v. Allen,* 396 U.S. 168, 192–93, 90 S.Ct. 314, 327–328, 24 L.Ed.2d 345 (1969), and will be followed unless there are compelling indications that the interpretation is erroneous, *see FCC v. WNCN Listeners Guild,* 450 U.S. 582, 598, 101 S.Ct. 1266, 1276, 67 L.Ed.2d 521 (1981).

Judge Rubin, writing in *Global Van Lines, Inc. v. ICC,* 704 F.2d 829, *modified,* 709 F.2d 11 (5th Cir.1983), already has shown us the way. That way is not new to petitioners' counsel as they represented

some of the same petitioners in *Global* and similar cases. In *Global*, Bekins Van Lines Company was awarded household goods contract carrier authority for three of its shipping customers over the objections of three of the same petitioners in this case, Wheaton, Global, and Allied. Petitioners now fare no better in this forum and for the same reasons.

■ Arnold's application, the supporting affidavits of the customers, petitioners' objections, and the Commission's decision are about all the evidence, but viewed generously we hold that the record sufficiently supports the Commission's action. There has been, however, no helpful improvement in the Commission's orders since Judge Rubin wrote:

> The evidence supporting the Commission's findings is not preponderant. Indeed, a skeptical evaluator might conclude that Bekins's proposals are difficult to distinguish from what the petitioners label them: contracts to provide preferential service at a reduced rate. But we are not charged with administration of the Act. Congress has delegated that function to the Commission.

*Global*, 704 F.2d at 832. We also share in this case Judge Rubin's view in evaluating the Commission's decision in *Global:* "It has drawn fine lines, distinguishing what we would, perhaps, have considered similarities, but its function is to make precisely this kind of decision, and ours is limited to review for arbitrariness." *Id.*

The Commission need not describe fully its policy and path in every decision, but may articulate the basis for its decisions by reference to other decisions. *See Atchison, Topeka & Santa Fe Railway Co. v. Wichita Board of Trade*, 412 U.S. 800, 807, 93 S.Ct. 2367, 2374, 37 L.Ed.2d 350 (1973). While the Commission here did not refer to other decisions by name, the involvement of some of these petitioners in the three Commission actions affirmed in *Global*, in the Commission action reversed on other grounds in *Aero Mayflower Transit Co. v. ICC*, 699 F.2d 938 (7th Cir.1983), and in thirty-two other Commission decisions, dismissed after *Global* was decided, indicates that the Commission had articulated its policy elsewhere sufficiently to carry over to this case.

Were we the Commission or had we broader powers of review, we might require some additional support for the findings, but there may be little more that could be said. The movement of household goods is, after all, not an unusually involved and difficult operation. Carriers, dispatchers, trucks, drivers, shippers, and the household goods themselves have more similarities than differences. If service is to be divided into two types, no purpose is served by trying to pretend that the differences are greater than they are and by requiring that a bright rigid line be drawn between the two types. That line must be reasonably flexible to accommodate different situations in furtherance of the new transportation policy. The mutual commitment of contract service is expected to lead to a more uniform, responsive, and personalized service to comply with the manner in which each shipper wants its business handled as it perceives its own particular needs. That arrangement should result in a more satisfactory service than the shipper could otherwise expect to receive from use of the famed Yellow Pages for each separate move. The carrier relying on the shipper's commitment and the anticipation of a certain quantity of business can better utilize its equipment and personnel to give the particular quality service desired by its customer at a price agreeable to both.

■ At oral argument, we inquired about the particular contracts between Arnold and its customers, but found they were not of record. We initially considered the contracts themselves to be the best confirmation of what contract service would actually be provided. We were interested in determining whether the guarantees mentioned in these proceedings were only illusory and meant merely to obscure a price discount while rendering but common carrier service. The contracts would perhaps have been helpful, but in this proceeding they are not critical. The

actual contracts may be challenged in a later proceeding which either the Commission on its own initiative or a competitor of Arnold may bring, on the grounds that the actual performance does not conform with a contract carrier's operations, *see* 49 U.S.C. § 10925(e),[10] or on the more general grounds that the carrier has violated the Act, *see* 49 U.S.C. § 11701 (Supp. V 1981).

■ Petitioners further argue that Arnold's proposed contract carrier service is no different than what Arnold already was rendering under its common carrier authority, except that with contract carrier authority it can now give a discount. Even if that is true, it is irrelevant. The same general type of service, previously rendered as common carrier service but now tailored to the distinct needs of shippers, may qualify for inclusion in the new contract carrier category of service regardless of whether it could have been rendered beforehand by Arnold or any of the petitioners. *See Global,* 704 F.2d at 833.

The Commission is satisfied, Arnold is satisfied, Arnold's customers are satisfied, but four of Arnold's competitors are not. The Commission reviewed petitioners' other concern that the door was being opened to potential discrimination among shippers and cut-throat competition among household goods carriers, but the Commission found that Arnold's contract carrier authority would neither endanger nor impair petitioners' operations to an extent contrary to the public interest. Arnold has been given no special dispensation; petitioners are free to seek contract carrier authority for themselves by meeting the flexible provisions of the new legislation, and in fact already have done so.

Having previously been sheltered by government control and supervision, petitioners are now beginning to experience the effects of genuine marketplace competition common to other enterprises. For some the adjustment to reality may be difficult, but Congress has determined that it is in the public interest. Clinging desperately to the safety of outmoded concepts is not preferable to adjustment to the new competitive environment.

The Commission's proceedings were not elaborate or particularly enlightening, but they were adequate and at least not arbitrary. We see no reason to interfere with the Commission's administration of its duties under the Act.

The petition for review is denied.

POSNER, Circuit Judge, dissenting.

If a trucking company is classified as a common carrier under the Interstate Commerce Act, it must charge, for the same service, the same rates to all customers, 49 U.S.C. § 10741(a); it cannot give a discount to some of them. But this irksome restriction does not apply if the trucker can get itself classified as a "contract carrier" with respect to those customers to whom it would like to offer a discount. In order to be classified as a contract carrier, however, it must show either that it means to assign particular trucks to those customers, which is not proposed in the present case, or that its service will be "designed to meet the distinct needs of each" customer. 49 U.S.C. § 10102(14)(B)(ii); see, e.g., *Interna-*

---

**10.** Section 10925(e), as amended by the Bus Regulatory Reform Act of 1982, provides:

(1) On application of a motor contract carrier who holds a permit issued under [49 U.S.C. § 10923], or on complaint of a competing motor common carrier who holds a certificate under [49 U.S.C. § 10922], or on its own initiative, if the Commission, after notice and an opportunity for a proceeding, determines that the operations under the permit or any part thereof—
(A) do not conform with the operations of a motor contract carrier; and
(B) are those of a motor common carrier;

the Commission may amend or revoke such permit or part thereof to conform the operations under such permit or part thereof to the operations of a motor contract carrier.

(2) The Commission may issue in place of any permit or part thereof revoked under this subsection a certificate under [49 U.S.C. § 10922] which authorizes the holder of such certificate to provide as a motor common carrier the same type of transportation between the same points or within the same territory as authorized in the permit or part thereof.

49 U.S.C.A. § 10925(e) (West Supp. 1983).

*tional Detective Service, Inc. v. ICC*, 595 F.2d 862, 865–66 (D.C.Cir.1979). The enforcement of this requirement is essential to the integrity of the Act's common carrier provisions; nonenforcement would allow trucking companies to offer discounts to preferred customers on any basis and for any reason they pleased, simply by applying to the ICC for contract authority and describing their deal with those customers as contract rather than common carriage. Of course the integrity of the Interstate Commerce Act may not be worth preserving. Society might well be better off allowing the prices for truck transportation to be determined by the free market, regulated only by the antitrust laws. But that is a judgment for Congress to make; and although the majority opinion is correct that Congress in recent years has loosened the Interstate Commerce Commission's grip over the trucking industry, it has not yet discarded the requirement that truckers who want to give discounts to particular customers rather than across the board show that they are serving the distinct needs of those customers. See H.R.Rep. No. 1069, 96th Cong., 2d Sess. 22 (1980), U.S.Code Cong. & Admin.News 1980, p. 2283. But, if one may judge from the present case, the Commission has decided to complete the deregulation of the carriage of household goods on its own, by no longer requiring moving companies to show any distinct customer needs as a condition of being allowed to operate as motor contract carriers.

The A. Arnold & Son Storage and Transfer Company sought authority to provide contract carrier service to three large corporations that pay their executives' moving expenses when the executives are transferred from one corporate office to another. These corporations are already customers for Arnold's common carrier services, with which they generally are well pleased. Unlike many other moving companies, which assign one crew to load the truck and another to unload it at its destination, Arnold uses one crew throughout, and apparently this results in faster and more reliable service. The corporations submitted in support of Arnold's application for contract carrier authority statements that assert their need for this distinctive service, and the application itself contains a commitment to provide it.

It is important to firms that have offices scattered around the country and that rotate executives among them to be able to move the executives' household goods with a minimum of the hassle so often encountered in dealing with moving companies; it is sufficiently important that the Commission could justifiably conclude that such firms have a need for the superior quality of service offered by Arnold that is distinct from the needs of others who use moving companies. The problem is that Arnold is already offering the same service, to the same customers, under its common carrier tariffs. The statements that the three corporate customers submitted in support of Arnold's application for contract carrier authority are, word for word, the same statements that those customers submitted in support of Arnold's application for common carrier authority, except that in connection with the present application they added, incorrectly, that Arnold proposes to dedicate particular trucks to serving them. (Arnold's application disavows any such proposal.) The application itself contains the very commitments (for example: "We will make a commitment to providing the same crew to pack, load, haul, unpack, and unload the shipments") on the basis of which Arnold obtained common carrier authority to serve these customers, see *A. Arnold & Son Transfer & Storage Co., Inc. Extension—Household Goods 42 States*, No. MC–34631 (Sub-No. 6F), initial decision at p. 2 (ICC Feb. 10, 1981), but describes them as different. However, if there are any real differences apart from the discount that Arnold proposes to offer, the Commission, as we shall see, has not identified them.

Why would Arnold, having obtained authority to provide on a common carrier basis the high-quality moving service that these large corporate customers demand, also desire authority to provide the identi-

cal service on a contract carrier basis? There is only one possible reason, and that is to allow Arnold to give a discount to some customers but not others. Its application states: "One of the first differences [between Arnold's proposed contract carrier service and its existing common carrier service] is that we will be much more competitive in our [contract carriage] rates that [than?] we have [been] with these shippers. It is our intent at the present time that our rates for these shippers will be approximately 10% lower than our rates charged as a common carrier." The paradox to be explained is why "the highest caliber of service" should be cheaper than regular service. It could be—there might be more than offsetting economies from dealing with these customers. But since it is entirely unclear how or whether Arnold's "highest caliber of service" differs from the regular service that it has been providing these and other customers under its one-crew concept, probably the "highest caliber of service" is not cheaper; probably it is the identical service merely being priced lower as a concession to particular customers. It is pretty obvious who these customers are and are not. Customers who do not have a good alternative to using Arnold will pay the higher common carriage rates; those who do have good alternatives—those who can make a credible threat to patronize another moving company—will pay the lower contract carriage rates. In other words Arnold wants to practice price discrimination. The charging of different prices for the same service to different customers depending on the customers' alternatives (in economic terminology, on the different elasticities of demand of different customers) is a form of price discrimination. And it is a form of price discrimination that the common carrier provisions of the Interstate Commerce Act are designed to prevent, *Western Transportation Co. v. Wilson & Co.*, 682 F.2d 1227, 1230–31 (7th Cir.1982), and that, therefore, until those provisions are rescinded, the contract carrier provisions of the Act must not be interpreted to allow.

The Commission's decision approving Arnold's application for contract carrier authority dismisses unthinkingly the issue I have just identified; in fact, it is the most perfunctory and least persuasive administrative decision that I have read since joining this court. The decision describes the application as one to provide a service featuring "guaranteed pick-up and delivery times and other special services not provided in common carrier tariffs." The small error in this statement is the remark that Arnold proposes guaranteed pick-up and delivery times; it does not; it says only that it "will guarantee that shippers will receive the highest caliber of service from our company ...," which is not the same thing (compare 49 U.S.C. § 10734(b)(1)), if indeed it is anything at all. (At another point the application states that Arnold's dispatcher "will be *authorized* to provide to the account that type of on-time pick-ups and on-time deliveries that is so important to the transfer of these personnel" (emphasis added).) The big error is the suggestion that the proposed services are not provided in common carrier tariffs; they are—in Arnold's common carrier tariffs. Elsewhere the Commission's decision states that the grant of contract carrier authority is based on Arnold's proposal of "services (such as guaranteed pick-up and delivery times) designed to meet the specialized transportation requirements of the shippers" and of "a specialized transportation service for the supporting shippers at lower rates designed to fit the length of their purses." The three passages I have quoted constitute the Commission's entire discussion relevant to the question of distinct needs. They add up to nothing.

Obviously, lower rates alone cannot justify contract carrier status. See, e.g., *Liberty Transfer Co., Inc. Extension—Specified Points*, 105 M.C.C. 437, 440–41 (1967). True, there is a suggestion in *ICC v. J–T Transport Co.*, 368 U.S. 81, 92–93, 82 S.Ct. 204, 211, 7 L.Ed.2d 147 (1961), that if a shipper cannot afford to pay common carrier rates this by itself might create a "distinct need" for lower contract carrier rates, but there is no indication that Arnold's

large corporate customers are too strapped to pay the common carrier rates for the service they are getting, though naturally they would like to pay less and may take their business elsewhere if Arnold will not charge them less. The factors emphasized in *International Detective Service, Inc. v. ICC,* 613 F.2d 1067, 1075–76 (D.C.Cir.1979), are also absent. If a lower rate is not enough by itself in these circumstances to establish a distinct need for contract carrier service, then a lower rate combined with a service offering identical to what the applicant is providing to the same class of shippers under its common carrier tariffs cannot be enough either; it is just a discount from the tariffed rate. There is as I have suggested only one reason why Arnold wants to provide the same service to the same group of customers at different rates; it wants to discriminate in price among these customers. The Commission must know this, but evidently it does not care, because it wants to get on with the great work of deregulating the trucking industry. This is nice, but lawless.

I hope I will not be misunderstood as arguing that Arnold may not limit to particular customers its commitment to provide one-crew service. Of course it may. But it does not want to limit its service to particular customers. It is happy to offer the service to all comers under common carrier tariffs; it just wants to be able to offer it at lower prices to select customers, which it may not do until and unless Congress deregulates trucking. *Global Van Lines, Inc. v. ICC,* 704 F.2d 829, modified, 709 F.2d 11 (5th Cir.1983), is not in point; there is no indication that the applicant in that case was already offering the same services between the same points to the same class of customers under its common carrier tariffs. Fully in point, however, are the remarks of the Sixth Circuit in reviewing another motor carrier decision of the ICC. "It is evident from the facts in the record that there is no substantial evidence to support the conclusions drawn by the ICC .... It is also troubling that the ICC failed to address points of error which were clearly not frivolous and which the protes-

tants urged with vigor.... With the basis for [the Commission's] conclusions not clearly articulated, the reviewing court must be left with the suspicion that the decision was made for a reason not stated in the record: solely for the purpose of increasing competition in the area in disregard of other policies articulated by Congress." *Argo-Collier Truck Lines Corp. v. United States,* 611 F.2d 149, 155 (6th Cir.1979).