**STEERE TANK LINES, INC., Petitioner,**

v.

**INTERSTATE COMMERCE COMMIS-SION and United States of America, Respondents.**

No. 82–4309
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

April 25, 1983.

Hugh T. Matthews, Dallas, Tex., for petitioner.

J. Carol Brooks, I.C.C., Robert B. Nicholson, Mark C. Del Bianco, U.S. Dept. of Justice, Washington, D.C., for respondents.

Before GEE, RANDALL and TATE, Circuit Judges.

TATE, Circuit Judge:

The petitioner, Steere Tank Lines, Inc., joined by Groendyke Transport, Inc., intervening petitioner, seeks review of an Interstate Commerce Commission order granting intervenor Cactus Transport, Inc. a certificate of public convenience and necessity to operate as a common carrier over irregular routes between points in Texas, New Mexico, Kansas, Oklahoma, Arkansas, and Colorado. We conclude that the Commission's order was neither arbitrary nor capricious and that it was based on substantial evidence. We affirm.

## I.

Cactus, a small intrastate carrier based in Texas, currently provides bulk service hauling petroleum and petroleum products between points within Texas using a fleet of eight truck tractors and seven tank trailers. On January 8, 1982, Cactus applied for a certificate of public convenience and necessity authorizing it to operate as a motor common carrier to transport petroleum and petroleum products between points in Texas, New Mexico, Kansas, Oklahoma, Arkansas, and Colorado. The application was supported by affidavits from seventeen shippers (of whom at least fourteen were using and were satisfied with Cactus' intrastate services), each stating that it needed Cactus' services interstate and would tender it business as soon as a certificate was issued. The application was approved May 14, 1982 by a three member Review Board, and affirmed by a division of three Commissioners, July 23, 1982.[1] Pursuant to 28 U.S.C. §§ 2321, 2341–2349, this appeal was taken.

Below and here, protestants-appellants Steere and Groendyke urge in their respective briefs (1) that the statewide operating authority granted Cactus for Texas and New Mexico was not based on substantial evidence since, in their view, the present and future Texas and New Mexico activities of the supporting shippers appear to be concentrated within the fairly limited geographic region comprising the Texas Panhandle and bordering counties of New Mexico, and (2) that Cactus failed to present adequate factual findings regarding Cactus' financial fitness to conduct the proposed operations.

## II.

Under the Motor Carrier Act of 1980, a carrier seeking a certificate of public convenience and necessity must show (1) that it is "fit, willing, and able" to perform the proposed services; and (2) that "the service proposed will serve a useful public purpose, responsive to a public demand or need"; if the Commission finds that the carrier has

---

1. Cactus was approved to operate as a common carrier by motor vehicle in interstate commerce over irregular routes, transporting petroleum and petroleum products, between points in Texas, New Mexico, Oklahoma, Kansas, Sebastian County (Arkansas) and Arpahoo County (Colorado). The statewide grants to operate in the four former states is termed "nonradial," while the authority to operate only to limited destinations in the two latter states is termed "radial" in the parlance of the industry.

made a prima facie showing to such effect, it will grant the certificate, unless protesting carriers show that "the transportation to be authorized by the certificate is inconsistent with the public convenience and necessity." 49 U.S.C.A. § 10922(b)(1) (West Supp.1982).[2] *Steere Tank Lines, Inc. v. I.C.C.,* 687 F.2d 104, 105 (5th Cir.1982) (*Steere II*); *Steere Tank Lines, Inc. v. I.C.C.,* 675 F.2d 103, 104 (5th Cir.1982) (*Steere I*); *American Trucking Associations, Inc. v. I.C.C.,* 659 F.2d 452, 469–70 (5th Cir.1981), *clarified and enforced through mandamus,* 669 F.2d 957, 963 (5th Cir.1982), *cert. denied* —— U.S. ——, 103 S.Ct. 1272, 75 L.Ed.2d 493 (1983).

■ Our review on appeal is limited to determining whether the Commission's conclusions were "arbitrary, [or] capricious, an abuse of discretion, ... not in accordance with law, ... [or] unsupported by substantial evidence." Administrative Procedure Act, § 10(e)(2), 5 U.S.C. § 706(2). If the Commission's findings are "grounded on 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'", they must be upheld. *Steere II, supra,* 687 F.2d at 105 (quoting *Richardson v. Perales,* 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)); *Steere Tank Lines, Inc. v. I.C.C.,* 694 F.2d 413, 418 (5th Cir. 1982) (*Steere III*).

## III.

■ Our own review of the seventeen supporting shipper affidavits submitted by

Cactus indicates that sufficient evidence was presented to support the Commission's conclusion that the "[a]pplicant [Cactus] has demonstrated a need for service throughout substantial portions of the territory sought", in what is "essentially an extension of the service it provides to shippers within the State of Texas." When viewed as a whole, we cannot conclude that the carefully drawn four-state-nonradial/two-state-radial authority granted to Cactus was arbitrary, capricious or not supported by substantial evidence. More than forty points scattered among the four-state area covered by the grant of nonradial authority were specifically mentioned by shippers, many of whom stated that such points were to be understood as a representative sampling, and not an exhaustive listing, of current shipping it would tender Cactus once it had obtained Commission certification.[3] While the specific evidentiary basis for granting nonradial operating authority to Cactus within all of New Mexico may seem somewhat thin when viewed in isolation, we cannot conclude that the Commission exceeded its broad discretion. As we recently stated:

> The fact that two different conclusions could be drawn from the evidence does not prevent the agency's finding from being supported by substantial evidence. As long as the ICC considers relevant factors and articulates a rational connection between the facts found and the choice made, the decision is not arbitrary or capricious [citations omitted].

**2.** 49 U.S.C.A. § 10922(b)(1) provides in full:

Except as provided in this section, the Interstate Commerce Commission shall issue a certificate to a person authorizing that person to provide transportation subject to the jurisdiction of the Commission under subchapter II of chapter 105 of this title as a motor common carrier of property if the Commission finds—

(A) that the person is fit, willing, and able to provide the transportation to be authorized by the certificate and to comply with this subtitle and regulations of the Commission; and

(B) on the basis of evidence presented by persons supporting the issuance of the certif-

icate, that the service proposed will serve a useful public purpose, responsive to a public demand or need;

unless the Commission finds, on the basis of evidence presented by persons objecting to the issuance of a certificate, that the transportation to be authorized by the certificate is inconsistent with the public convenience and necessity.

**3.** *See e.g.,* the affidavits submitted by Hughes Oil, Inc. [R. 32]; C & B Tank Company [R. 36]; Weskom, Inc. [R. 42]; Perryton Fuel, Inc. [R. 47]; Spearman Super Service, Inc. [R. 55]; E–Z Serve [R. 59]; and Pride Petroleum, Inc. [R. 66].

*J.H. Rose Truck Line, Inc. v. I.C.C.,* 683 F.2d 943, 948 (5th Cir.1982).

## IV.

■ We likewise reject the protestants' argument that Cactus failed to make a showing adequate to sustain a finding of financial fitness. While it is true that a

---

4. See "Rules Governing Applications for Operating Authority," Ex Parte No. 55 (Sub.-No. 43), 364 I.C.C. 539–540 (1980):

DELETION OF FINANCIAL INFORMATION

As several persons pointed out, we had no specific requirement under the interim rules for an applicant in a fitness only application to file financial information. We have eliminated this requirement for all types of applications in the final rules, since we do not believe that this information serves any useful purpose.

To determine fitness we have historically considered the financial fitness of an applicant, applicant's willingness to adhere to Commission regulations, and the carrier's ability to perform service in a safe manner for the protection of the public.

The Commission has never established a fixed, minimum dollar limitation as a prerequisite for a carrier's entry into the regulated trucking industry. We have recognized that many new entrants start small. In recent years we have adopted a standard that the financial fitness of an applicant is pertinent only in relation to whether it can adequately conduct the proposed operation. The question for resolution has been whether an applicant is sufficiently capitalized to undertake the specific operations it intends to conduct. [30]

We can think of no substantial reason to continue this examination. In a more heavily regulated environment, where the regulatory agency rather than the marketplace was the prime guarantor of service, a policy that we wanted to ensure that an applicant could actually conduct the operation it was proposing may have had validity. Since the newly authorized carrier would soon be accorded the benefits of all the evidentiary presumptions which historically ran in its favor, it was reasonable that the new carrier should be required to uphold its part of the regulatory bargain, i.e., it would perform the operation as proposed.

The basis for this policy no longer exists. Under Ex Parte No. MC–121, *supra,* and the new act, carriers are encouraged to tailor price and service options in such a way that the public will have greater choices. The marketplace will ultimately determine the financial success of a proposed operation. At the same time, a financial failure will not translate into any long-term service vacuums

---

specific financial information requirement has been eliminated from the Commission's present application procedure [4] (although 49 U.S.C. § 10922(b)(1) retains the former requirement that the applicant is "*fit,* willing, and able" to provide the service), Cactus' two and a half years of successful intrastate operations, its fleet and facilities, pro-

---

since our entry policies will permit the rapid replacement of carriers that fail. This is not to say that we are unconcerned with the common carrier obligation and service to small shippers and communities.[31] We will continue to examine equipment availability, however, and an applicant will be required to describe its equipment, or how it would obtain equipment to perform the operation in the short run; see final rule section 1100.-251(f)(5).

We are concerned that undue regulatory reliance on a carrier's unfavorable financial picture may unnecessarily block entry for many small companies. It is axiomatic that many small companies survive just on the basis of hard work, an asset that cannot be portrayed in balance sheets. In other cases, additional authority is the very means by which a struggling company can reverse its financial fortunes.

Finally, we have great doubts about the past effectiveness of the financial fitness examination. Many carriers have received an affirmance of their overall fitness, including financial fitness, only to file bankruptcy petitions soon thereafter. The bankruptcy laws and the insurance requirements imposed on carriers serve as adequate protection to the public. Our past examination has had little or no correlation to the ongoing ability of a company to survive.

Therefore we will delete the financial information requirement for all motor carriers. We will also delete this requirement for water carriers, forwarders, and brokers, who are governed by similar insurance and bankruptcy laws.

We do offer one observation in connection with financial information. Although we shall eliminate an affirmative requirement that the applicant file evidence demonstrating financial fitness in the traditional sense, we are prepared to examine any financial activity which may bear on the carrier's treatment of its customers. We expect parties raising fitness questions to point with specificity to customer abuses.

[30] *Consolidated Carriers, Inc., Common Carrier Application,* 131 M.C.C. 104, 108 (1978).

[31] We believe that with freer entry, carriers, in the absence of high regulatory barriers, will more willingly seek authority to serve less busy, and perhaps less profitable areas.

vided a more than adequate evidentiary basis for the Commission's findings that Cactus' statutorily required "fitness is adequately demonstrated by its past bulk petroleum service within Texas"—for the new certificate's authority merely provided a more extended territorial basis within which for Cactus to perform similar services, with the Commission-noted availability of Cactus' equipment to do so.

As we stated in rejecting similar contentions in *Steere II,* since the applicant:

> has fifteen pieces of equipment (truck tractors and trailers) with which to perform the proposed service . . . [and] it is already engaged in the petroleum hauling business between points in Texas . . ., [the appellant's] argument that [the applicant] was not properly found to be fit, willing, and able . . . verges on the frivolous. *See Steere* [*I, supra*] ("fit, willing and able" determination upheld for company that operated sixteen trucks from one terminal); *cf. American Trucking* [*supra,* 659 F.2d at 473] (negative implication that carrier already having tank trucks and experienced in their proper use is virtually automatically "fit, willing, and able" to serve public for such loads), *clarified and enforced through mandamus,* 669 F.2d 957 (1982).

*Steere II, supra,* 687 F.2d at 106.

*Conclusion*

Accordingly, the order of the Commission is AFFIRMED.

AFFIRMED.