714 F.2d 588
 DRESSER INDUSTRIES, INC., Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents.
WYO BEN, INC., Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents.
 Nos. 82-4066, 82-4304.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 16, 1983.
 
 Donald A. Sutherlund, Washington, D.C., for petitioner, Dresser Industries, Inc.
 Russell S. Sage, Alexandria, Va., for petitioner, Wyo Ben, Inc.
 John Broadley, Gen. Counsel, Kathleen V. Gunnine, Atty., ICC, John J. Powers, III, Kenneth P. Kolson, Dept. of Justice, Washington, D.C., for respondents.
 Donal L. Turkal, Curtis H. Berg, Alan R. Post, St. Paul, Minn., John F. Whitney, New Orleans, La., for intervenors, Burlington Northern R. Co., et al.
 Petitions for Review of Orders of the Interstate Commerce Commission.
 Before THORNBERRY, GEE and WILLIAMS, Circuit Judges.
 THORNBERRY, Circuit Judge:
 
 INTRODUCTION:
 
 1
 In these consolidated cases, petitioners Dresser Industries, Inc. [Dresser] and Wyo-Ben, Inc. [Wyo-Ben] seek review of decisions by the Interstate Commerce Commission [the Commission] and Review Board Number 3 of the Interstate Commerce Commission [the Board]. In their separate decisions, both the Commission and the Board determined that, in charging petitioners more to ship iron ore pelletizing [IOP] bentonite clay from Thermopolis, Greybull, and Lovell, Wyoming [prejudiced points] to Minnesota, Wisconsin, and Michigan [destination territories], than it charged a competing shipper to transport IOP bentonite a longer distance over the same line from Casper, Wyoming [preferred point] to the destination territories, Burlington Northern Railroad Company [BN] did not violate either 49 U.S.C.A. § 10726(a)(1)(A), 49 U.S.C.A. § 10741(a), or 49 U.S.C.A. § 10741(b). We conclude that since the decisions rendered by the Commission and the Board were supported by substantial evidence, and were neither arbitrary nor capricious, they must be allowed to stand. Accordingly, we AFFIRM.
 
 FACTS:
 
 2
 Dresser and Wyo-Ben are IOP bentonite shippers served exclusively by BN and its connecting carriers. IOP bentonite is a soft, porous clay formed by the weathering of volcanic ash that is used in the production of taconite, a concentrated form of iron manufactured from relatively low grade iron ore. The taconite industry in this country is centered primarily in Minnesota, Wisconsin and the upper peninsula of Michigan.
 
 
 3
 Because of its great bulk and low value, IOP bentonite must be shipped by rail. Because of IOP bentonite's generally uniform quality regardless of producer, delivered price is the single most important factor in the sale of this commodity to the taconite industry.
 
 
 4
 Dresser's plant at Greybull, and Wyo-Ben's plants at Thermopolis, Greybull and Lovell are all located in the same general area of Wyoming, west of the Big Horn Mountains. BN moves much of the traffic from these plants north through Laurel and Billings, Montana, then east through southern Montana and North Dakota to the destination territories [BN's northern route] (see appended map). BN also moves some of this traffic south over a longer route through Casper, Wyoming and then east through Nebraska to the destination territories [BN's southern route]. BN also uses these routes to ship IOP bentonite produced by Black Hills Bentonite Company, a competitor of Dresser and Wyo-Ben's located at Casper, Wyoming. Casper is located 142 miles south of Thermopolis, 210 miles south of Greybull, and 243 miles south of Lovell on BN's northern route.
 
 
 5
 The Chicago and North Western Transportation Company [CNW] also ships IOP bentonite produced by Black Hills Bentonite out of Casper. CNW's short tariff route is the shortest of all the routes from Casper to the destination territories. However, because of self-imposed internal weight restrictions, CNW does not ship IOP bentonite via this route.[1] Instead, it uses its longer, alternate route through Dakota Junction, Nebraska, Missouri Valley and Sioux City, Iowa to ship IOP bentonite from Casper to the destination territories. However, CNW is authorized to and does offer its short tariff rate on shipments out of Casper that are moved over its alternate route.
 
 
 6
 In the 1950s, the CNW and BN's predecessors--the Northern Pacific Railway Company, the Great Northern Railway, and the Chicago, Burlington and Quincy Railroad Company [CBQ]--established two groups of rates from the Big Horn Basin of Wyoming to the destination territories. Greybull, Lovell, Thermopolis and all other points west of the Big Horn Mountains formed the west side rate group. Those shipping points located east of the Big Horn Mountains formed the east side rate group. East side rates were lower because different rail carriers competed for freight from east side points, and because these points were located closer to the destination territories than were west side points. When in 1965 one of CBQ's customers moved east of the Big Horn Mountains to Casper, Wyoming, the CBQ filed an east side rate for all movements from Casper. The CNW also established an east side rate from Casper at that time.
 
 
 7
 As of July 5, 1981, BN's rail rate on IOP bentonite shipments from the prejudiced points of Thermopolis, Greybull and Lovell to Minnesota destinations was $38.30 per net ton, while the rate from the preferred point at Casper to the same destinations was only $37.00 per net ton, for a difference of $1.30 per net ton. At the same time, BN's rail rate on IOP bentonite from the prejudiced west side points to Michigan destinations was $40.56 per net ton, while the rate from Casper to the same destinations was again $37.00, for a difference of $3.56 per net ton. BN's rates from Casper to the destination territories are identical to CNW's rates from that city to the destination territories. Since BN charges either $1.30 or $3.56 per net ton more to ship IOP bentonite from points which are 142 (Thermopolis), 210 (Greybull) and 243 (Lovell) miles closer to the destination territories than Casper, BN indisputably charges Dresser and Wyo-Ben more to ship their IOP bentonite a shorter distance than it charges Black Hills Bentonite at Casper to ship IOP bentonite a longer distance to the same destinations.
 
 
 8
 Because of this rate disparity, Wyo-Ben and Dresser filed separate complaints with the Commission, charging that BN had violated 49 U.S.C.A. § 10726(a)(1)(A) [hereinafter section 26(a)(1)(A) ] and 49 U.S.C.A. § 10741(a), (b) [hereinafter sections 41(a) and 41(b) ]. The substance of these complaints is dealt with in our analysis infra. In separate decisions, the Commission and the Board found that BN had violated none of the cited provisions.
 
 ANALYSIS:
 Standard of Review
 
 9
 A decision by the Commission is presumptively valid.[2] The Administrative Procedure Act in 5 U.S.C.A. § 706 provides that:
 
 
 10
 The reviewing court shall ...
 
 
 11
 (2) hold unlawful and set aside agency action, findings, and conclusions found to be--
 
 
 12
 (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law [or] ...
 
 
 13
 * * *
 
 
 14
 (E) unsupported by substantial evidence....
 
 
 15
 5 U.S.C.A. § 706(2)(A), (E) (West 1977). This Court applies the arbitrary and capricious-substantial evidence standard in reviewing decisions by the Commission. See Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974).[3] To the extent that the Commission's interpretation of section 26(a)(2), or sections 41(a), (b) might represent the adoption of some new standard, we are still bound by the arbitrary and capricious-substantial evidence standard in our review of its action. Nueces County Navigation District No. 1 v. ICC, 674 F.2d 1055, 1062 (5th Cir.), cert. denied, --- U.S. ----, 103 S.Ct. 446, 74 L.Ed.2d 601 (1982).[4]
 
 
 16
 The Supreme Court in Bowman set out the limits of appellate review under the arbitrary and capricious standard.
 
 
 17
 Under the "arbitrary and capricious" standard the scope of review is a narrow one. A reviewing court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.... Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." Citizens to Preserve Overton Park v. Volpe, supra, 401 U.S. at 416, 91 S.Ct. at 824 [28 L.Ed.2d 136]. The agency must articulate a "rational connection between the facts found and the choice made." Burlington Truck Lines v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962). While we may not supply a reasoned basis for the agency's action that the agency itself has not given, SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947), we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned. Colorado Interstate Gas Co. v. FPC, 324 U.S. 581, 595, 65 S.Ct. 829, 836, 89 L.Ed. 1206 (1945).
 
 
 18
 Bowman, 95 S.Ct. at 442. This Court has in numerous cases applied the Supreme Court's guidelines under that standard in ICC cases.[5]
 
 
 19
 Substantial evidence, while less than the weight of the evidence,[6] is such evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971).[7] The fact that two different conclusions could be drawn from the evidence does not preclude the Commission's finding from being supported by substantial evidence.[8]49 U.S.C.A. § 10726
 
 
 20
 The administrative law judge [ALJ] in Dresser found that BN charged a higher rate for transporting IOP bentonite from Greybull to destination, than for transporting the same commodity a longer distance from Casper to destination. The ALJ concluded that this rate disparity constituted a prima facie violation of the long haul/short haul clause of the Interstate Commerce Act, which provides:
 
 
 21
 (a)(1) A carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under subchapter I or III of chapter 105 of this title (except an express carrier) may not charge or receive more compensation for the transportation of property of the same kind or of passengers--
 
 
 22
 (A) for a shorter distance than for a longer distance over the same line or route in the same direction (the shorter distance being included in the longer distance).
 
 
 23
 49 U.S.C.A. § 10726(a)(1)(A) (West Supp.1983). However, the ALJ in Dresser ultimately concluded that the challenged rate disparity fell within the exception to section 26(a)(1)(A) provided by section 26(a)(2), which states:
 
 
 24
 (2) Notwithstanding paragraph (1) of this subsection, a carrier operating over a circuitous line or route to or from a place in competition with another carrier of the same type that operates over a more direct line or route may establish a rate (otherwise complying with this chapter) for that transportation to meet the rate of the carrier operating over the more direct line or route.
 
 
 25
 49 U.S.C.A. § 10726(a)(2) (West Supp.1983). The ALJ determined that section 26(a)(2) authorized the carrier (BN) moving over a circuitous route (BN's northern route) from a place (Casper) in competition with another carrier of the same type (CNW) operating over a more direct route (CNW's short tariff route) to establish a rate (BN's northern route rate for traffic from Casper to the destination territories) to meet the rate of the carrier operating over the more direct route (CNW's short tariff rate for traffic from Casper to destination). In so doing, he correctly noted that the purpose of section 26(a)(2) is to allow the circuitous route carrier (BN) to compete on an equal basis with the carrier enjoying the more direct route (CNW) without extending the reduced rate at the preferred point (Casper) to shippers (Dresser) at other points on its route (Greybull) where the same competitive forces are not present. Both the Board and the Commission approved the ALJ's decision without comment.
 
 
 26
 The ALJ in Wyo-Ben similarly determined that although Wyo-Ben's plants at Thermopolis, Greybull and Lovell were respectively 142, 210 and 243 miles closer to destination than Casper, BN was authorized under section 26(a)(2) to charge more for shipments along its northern route from these prejudiced points than for shipments from Casper. The Board affirmed, finding that because BN had demonstrated: (1) that it competed for traffic with CNW at the preferred point; (2) that it faced no competition at the prejudiced points; and (3) that CNW enjoyed the most direct line (CNW's short tariff route) from Casper to the destination territories, BN was entitled to charge more for shipments from the prejudiced points than for shipments from the preferred point. The Board considered Wyo-Ben's contention that although CNW had the most direct route from Casper to destination, it did not carry IOP bentonite over that route because of self-imposed internal weight restrictions, and that the route actually used by CNW to ship IOP bentonite from Casper to destination (CNW's alternate route) was actually longer, and therefore less direct, than BN's northern route. However, the Board rejected the argument that these facts precluded BN from relying upon section 26(a)(2), stating that:
 
 
 27
 Short-line tariff mileages have traditionally been used to compute mileages, regardless of how the carrier handles the movement internally. It has been recognized that a carrier may route a shipment over some route other than its short-line route for its own operating purposes, but that the shipper should be charged according to the short-line route. A comparison of the BN's and CNW's short-line routes shows that the CNW has the most direct route. The fact that CNW may internally decided [sic] to operate over another route, or that complainant may choose another of CNW's routes, does not negate the fact that CNW's presence creates real and substantial competition for the BN at Casper.
 
 
 28
 Both Dresser and Wyo-Ben contend again on appeal that: (1) because CNW's short tariff route is subject to internal weight restrictions precluding its use for IOP bentonite shipments; and (2) CNW's alternate route, which it actually uses to ship IOP bentonite from Casper to destination, is 13 miles longer than BN's shortest route (BN's northern route), BN therefore possesses the more direct route from Casper to destination, and may not avail itself of the exception provided in section 26(a)(2). Refracted through the lens of section 26(a)(2), this argument is variously presented by petitioners in the following forms: (1) Since CNW does not ship IOP bentonite over its short tariff route, and its other routes are longer than BN's northern route, CNW is not another carrier of the same type "that operates over a more direct line or route"; (2) BN is not establishing its Casper rate "to meet the rate of the carrier operating over the more direct line or route." Because of the way the statute is worded, these arguments are essentially indistinguishable from one another in substance, if not in form.
 
 
 29
 Dresser and Wyo-Ben seek to impose upon section 26(a)(2) a technical and unrealistic construction in total disregard of its underlying purpose.
 
 
 30
 Prior to the enactment of section 26(a)(2), carriers operating over circuitous routes who found themselves faced with competition from similar carriers operating over more direct routes had to apply to the Commission for an exemption from the section 26(a)(1)(A) prohibition against charging higher rates for shipments travelling shorter distances along the same line to the same destination. In proceedings leading to the enactment of section 26(a)(2), the House Commerce Committee set out the statute's purpose in the following terms:
 
 PURPOSE OF BILL
 
 31
 The purpose of the bill, by amending Section 4(1) [Section 26(a)(1)(A) ] of the Interstate Commerce Act, is to eliminate prior approval of the Interstate Commerce Commission for the publication of rates over "circuitous routes" equivalent to going rates for a "direct route" of the same type of carrier when, in the managerial discretion of the carriers, such rates are necessary for competitive reasons.
 
 
 32
 H.R.Rep. No. 577, 85th Cong. 1st Sess. (1957), U.S.Code Cong. & Admin.News 1957, pp. 1301, 1301 (emphasis added).
 
 
 33
 Neither Dresser nor Wyo-Ben disputes that, in accordance with the traditional and accepted method of setting rail rates, CNW offers its short tariff rate to shippers shipping IOP bentonite from Casper to destination along its alternate route. Furthermore, neither Dresser nor Wyo-Ben attacks this practice, or claims that it is in any way unusual, impermissible or unfair.
 
 
 34
 It is undisputed that BN's only competitor at Casper is CNW, and that BN faces no rail competition at the prejudiced points. For purposes of this appeal, the only competition addressed by section 26(a)(2) and faced by BN is rate competition at Casper. From BN's perspective, it is irrelevant whether CNW actually ships IOP bentonite via its short tariff route, or along its alternate route. As long as CNW is authorized and does offer shippers its short tariff rate on all IOP bentonite traffic originating at Casper, then that is the rate with which BN will have to compete.
 
 
 35
 Indeed, close reading of section 26(a)(2) reveals that the purpose of that statute is to permit a disadvantaged carrier to meet a lawful rate established by a competing carrier; the statute by its words only applies where the carrier operating over the more circuitous line or route is "in competition with another carrier of the same type." Whether CNW does or does not operate over a more direct route is itself insignificant; the existence of the short tariff route is significant in the context of section 26(a)(2) only insofar as it permits CNW to charge a short tariff rate that undercuts BN's rate from Casper to destination, that is, to enjoy a competitive advantage of which BN would otherwise be deprived. Returning to the language of section 26(a)(2): (1) The fact that CNW does not "operate" over a more direct route is irrelevant; from the perspective of the competing carrier (BN), the competitive rate threat from CNW is as real as if CNW actually shipped IOP bentonite over its short tariff route; (2) Since CNW offers only the short tariff rate out of Casper, that is the rate which BN must "meet."
 
 
 36
 Under the standard of review applicable in cases of this sort, we have no difficulty discerning the path taken by the Board in denying Wyo-Ben's section 26(a)(1)(A) claim. The Board's reasoning was no different from our own. In denying Dresser's section 26(a)(1)(A) claim, the Commission adopted the factual findings and conclusions of the Board and the ALJ. The Board refused to disturb the findings and conclusions of the ALJ in that case, and the ALJ's decision was based upon sound reasoning identical to our own. It is true that neither the ALJ nor the Board in Dresser were presented any evidence that CNW did not in fact ship IOP bentonite over its short tariff route to destination. However, in denying Dresser's petition to reopen, the Commission noted that this new evidence had been considered and disposed of by the Board in the Wyo-Ben proceeding, thereby indicating its approval of the Board's treatment of this evidence. Although not explicit, the Commission's reasoning in rejecting the petition to reopen on the basis of the new evidence is readily discernible; we need engage in no post hoc rationalization to supply our own analysis where the Commission has already indicated its adoption of the Board's analysis in a separate proceeding. Bowman, 95 S.Ct. at 442.
 
 
 37
 Advancing yet another variation on a now familiar theme, Dresser and Wyo-Ben contend that because BN's predecessor, the CBQ, first established the rate at Casper and has controlled the rate there since that time, BN is not acting "to meet the rate of the carrier operating over the more direct line or route," here, CNW.[9] We decline the invitation to split this particular hair with petitioners. The historical inquiry into who first set the Casper rate is not dispositive of this issue; the point is that the rate at Casper is lower than at the prejudiced points, the Casper rate currently practiced by CNW is its short tariff rate, and BN could not charge less for shipments from Casper than from its prejudiced points unless CNW was entitled to practice its short tariff rate at Casper. There is no evidence that BN has controlled the rate at Casper up to the present time.
 
 
 38
 Indeed, petitioners' earlier argument that BN is not entitled to practice CNW's short tariff rate at Casper because CNW's short tariff line is not operable for IOP bentonite shipments presumes that the prevailing rate at Casper is CNW's, and not BN's. Were this not so, petitioners would be arguing that because CNW's short tariff route is inoperable, BN is precluded from meeting a rate established and maintained by BN. Petitioners cannot have it both ways. And in any event, section 26(a)(2) simply authorizes BN to set a rate "to meet the rate of the carrier operating over the more direct line or route." We have already established that, for BN's purposes, CNW is the carrier operating over the more direct line or route. CNW's short tariff rate is the rate BN is authorized to meet under section 26(a)(2).
 
 
 39
 Dresser also argues on appeal that there is no competition at Casper, claiming that the record contains not a shred of evidence that CNW ships IOP bentonite from Casper to the destination territories. However, the decision of the ALJ in Wyo-Ben contains the following statements:
 
 
 40
 Wyo-Ben competes with several concerns in marketing IOP bentonite to the taconite industry. For example, Black Hills Bentonite Company, a leader over the years in sales volume, has a major facility located in Casper.... Wyo-Ben stresses that if [sic] filed this complaint because "of the discriminatory rail rate structure which exists" relative to the transportation of IOP bentonite to taconite producers in Minnesota and Michigan as between its facilities and that of its principal competitor, Black Hills at Casper. It details in the record that the rail rate on IOP bentonite from each of its facilities to Minnesota destinations is $38.30 per net ton, while that from Casper to the same destination is $37.00 a net ton.... The rail rate on IOP bentonite from each of its facilities to Michigan destinations is $40.56 per net ton, while that from Casper to the same destination is $37.00, a difference of $3.56 per net ton.... Around 1965, the eastern district IOP bentonite rate was extended to Casper when Black Hills established a new bentonite plant and closed their Moorcroft plant.
 
 
 41
 The Commission in its Dresser decision found that a total of 1250 cars of clay were moved by CNW from east side points in October 1979 alone. Furthermore, in a verified statement submitted to the Commission, Mr. Melvin K. Lofton, Traffic Manager for Dresser's Domestic Oilfield Products Group, stated that some service was provided by CNW out of Casper.
 
 
 42
 As noted above, the Commission reviewed the Board's Wyo-Ben decision in rejecting Dresser's petition to reopen. We conclude that the above information excerpted from the ALJ's decision in Wyo-Ben, coupled with the Commission's findings in Dresser and Mr. Lofton's statement, constitute evidence sufficiently substantial to support a finding that CNW competed with BN for IOP bentonite shipments at Casper.
 
 
 43
 Last, Dresser argues that because section 26(a)(2) is only applicable to rates otherwise complying with Chapter 107 of the Interstate Commerce Act, and that BN's Greybull rate is violative of sections 41(a) & (b), BN may not rely on section 26(a)(2) to justify charging more for shipments from the prejudiced points, than from the preferred point. Even if BN's Greybull rate did violate section 41(a) or (b), the rate which section 26(a)(2) states must otherwise be in compliance with this chapter is not BN's Greybull rate, but its Casper rate. And in any event, even if Dresser's interpretation did not fly in the face of the plain language of section 26(a)(2), our conclusion infra that BN's Greybull rate does not violate either sections 41(a) or (b) disposes of Dresser's claim.
 
 
 44
 Our examination of section 26, the evidence, and Dresser's and Wyo-Ben's several arguments leaves us with the firm conviction that neither the Commission's disposition of Dresser's section 26(a)(1)(A) claim, nor the Board's resolution of Wyo-Ben's challenge under that same subsection, was arbitrary or capricious, or unsupported by substantial evidence. Accordingly, we AFFIRM that portion of those decisions rejecting Dresser's and Wyo-Ben's claims under section 26(a)(1)(A).
 
 49 U.S.C.A. § 10741(b)
 
 45
 49 U.S.C.A. § 10741(b) provides in pertinent part:
 
 
 46
 (b) A common carrier providing transportation or service subject to the jurisdiction of the Commission under chapter 105 of this title may not subject a person, place, port, or type of traffic to unreasonable discrimination.
 
 
 47
 49 U.S.C.A. § 10741(b) (West Supp.1983) (emphasis added). Dresser and Wyo-Ben claim that by charging more for shipping IOP bentonite from the prejudiced points than from the preferred point, BN subjects them to unreasonable discrimination under section 41(b).
 
 
 48
 It is well settled that to prove a violation of this section, it must be shown that:
 
 
 49
 1. A rate disparity exists;
 
 
 50
 2. There is actual or potential competitive injury;
 
 
 51
 3. The defendant is the common source of both the prejudicial and preferential rate; and
 
 
 52
 4. The rate disparity is not justified by transportation conditions.
 
 
 53
 Harborlite Corp. v. ICC, 613 F.2d 1088, 1091-92 (D.C.Cir.1979); State of New York v. United States, 568 F.2d 887, 898 (2d Cir.1977); A. Lindberg & Sons v. United States, 408 F.Supp. 1032, 1037 (W.D.Mich.1976). Once the first three elements are shown, the burden shifts to defendant to show that the rate disparity is justified by transportation conditions. Harborlite, 613 F.2d at 1092.
 
 
 54
 The ALJ in Dresser found that each of the first three conditions had been met, and that the rate disparity was not justified. On appeal, however, the Board held that the presence of CNW at Casper was a competitive restraint justifying the difference in rates. The Commission affirmed.
 
 
 55
 The ALJ in Wyo-Ben found that BN's rates at the prejudiced points did not violate section 41(b). The Board affirmed, holding that the existence of carrier competition at one point and lack of carrier competition at another constituted a difference in transportation conditions under section 41(b). Relying on the ALJ's finding under section 26(a)(2) that carrier competition existed at Casper, but not at the prejudiced points of origin, the Board concluded that defendants had established a difference in transportation conditions under section 41(b).
 
 
 56
 Both the Commission and the Board relied principally upon H. Samuels Co. v. Atchison, Topeka & Santa Fe Ry., 364 I.C.C. 280 (1980) in reaching their conclusions. The Board in Samuels stated that:
 
 
 57
 A rate disparity is not unreasonably discriminatory if it is justified by a difference in transportation conditions. A condition that may differ between compared services is the availability of alternative transportation.
 
 
 58
 Id. at 285. Wyo-Ben argues on appeal that this rule only applies where the rail carrier does not control the rates at both the preferred and prejudiced points, quoting the following language from Samuels:
 
 
 59
 As a general matter, we intend to recognize common control only where a carrier or source has such direct and obvious control of both the higher and lower rates that it can reasonably be held responsible for treating the complainant and its competitors differently.
 
 
 60
 Id. at 282. Wyo-Ben claims that because BN allegedly controls the rates at both Casper and the prejudiced points, it "can reasonably be held responsible for treating the complainant and its competitors differently," and thus unreasonably discriminates against Wyo-Ben. This argument misses the mark completely. Common control is the third element that must be proved to make out a violation of section 41(b), not the fourth. A carrier can have actual control of rates at both the preferred and prejudiced points and still not discriminate unreasonably against the shipper at the prejudiced point as long as the preferred rate is justified by the existence of a valid transportation condition. The Board in Samuels found that even where the railroad had common control of rates at both the preferred and prejudiced points, its discriminatory rates were not unreasonable because the competitive rates of other carriers at the preferred point constituted such a condition. Samuels does not say that competition at the preferred point is a valid transportation condition only where the carrier does not control the rates at both the preferred and prejudiced points. Indeed, if the carrier were shown to control the rates at only one of these two classes of points, complainant would have failed utterly to prove the third element of his action, and there would be no need for the carrier to then show the existence of a valid transportation condition. Samuels stands for the proposition that where the carrier controls the rates at both points, the disparity between them is not unreasonably discriminatory where a valid transportation condition exists in the form of a competing carrier at the preferred point.[10]
 
 
 61
 Dresser claims that if BN controls both its own and CNW's rates at Casper, then CNW is not a competing carrier whose presence at Casper constitutes a transportation condition justifying BN's discriminatory rate structure. Dresser makes three arguments.
 
 
 62
 First, Dresser claims that because BN has the shortest operable route from Casper to the destination territories, it also has the least expensive and most competitive route. Consequently, Dresser argues, BN controls the rate at Casper, a rate independent of CNW's Casper rate.
 
 
 63
 In our analysis of Dresser's and Wyo-Ben's claim under section 26(a)(1)(A), we concluded that even if BN had the shortest route from Casper to destination along which IOP bentonite was actually shipped, the fact that CNW was authorized to, and did, charge the lower short tariff rate on its alternate route justified BN's lower rate at Casper, as well as the resulting disparity between rates at the preferred and prejudiced points. We concluded that CNW was a competing carrier at Casper despite the internal weight restrictions on its short tariff route. Our conclusion applies with equal force here. CNW presents a competitive threat to BN at Casper. Under Samuels, this competition is a transportation condition justifying the otherwise unreasonable rate disparity.
 
 
 64
 Second, Dresser argues that because the rate at Casper was initiated by BN's predecessor, CBQ, BN controls that rate today. Our disposition of that argument in our treatment of the section 26(a)(1)(A) claims supra is controlling here. Determining that a carrier initiated a rate many years ago does not establish that this same carrier controls the rate today. The lower rate practiced by both BN and CNW at Casper is CNW's short line rate. This rate is a competitive restraint, and a valid transportation condition justifying BN's discriminatory rate structure.
 
 
 65
 Last, Dresser and Wyo-Ben ask this Court to reverse the decisions of the Board and the Commission for their failure to consider whether the degree of rate disparity was justified. In Harborlite Corp. v. ICC, 613 F.2d 1088 (D.C.Cir.1979), the D.C. Circuit held that:
 
 
 66
 It is insufficient for the carrier to show that transportation circumstances are not identical for the allegedly preferred and the allegedly prejudiced shipments, for the question is not whether any disparity is warranted. What the carrier must justify is the particular disparity existing in the case under consideration.
 
 
 67
 Id. at 1100. The Court went on to remand that case because the Commission had failed to determine whether the disparity in rates accurately reflected the differences in costs on the two lines.
 
 
 68
 Our case is quite different from Harborlite. Neither Dresser nor Wyo-Ben challenged CNW's Casper rate. We have already determined that BN is authorized to meet that rate under section 26(a)(2), and that CNW's rate constitutes a competitive restraint on BN. Petitioners challenge the disparity between BN's Casper rate, and its rate at the prejudiced points. The only condition justifying this disparity is CNW's competitive Casper rate. No other competitive advantages are claimed in justification of this disparity, and none need therefore be considered in our calculus. Where the sole transportation condition alleged in justification of a rate disparity is the lower rate of a competitor, and the challenged carrier in seeking to equalize its competitive position merely meets the lower rate without going below it, we need search no further to justify the degree of disparity between the challenged carrier's rates at the preferred and prejudiced points. Here, the disparity is no more than is required for BN to meet CNW's competitive Casper rate, and is both fully explained and adequately justified by that rate.
 
 
 69
 CNW's short tariff rate at Casper is a competitive constraint and a transportation condition rendering BN's rate discrimination reasonable. We conclude that those portions of the decisions by the Commission in Dresser and the Board in Wyo-Ben denying petitioners' claims under section 41(b) were neither arbitrary nor capricious, and were supported by substantial evidence. Accordingly, we AFFIRM.
 
 49 U.S.C.A. section 10741(a)
 
 70
 Section 49 U.S.C.A. section 10741(a) provides:
 
 
 71
 (a) A common carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under subchapter I of chapter 105 of this title may not charge or receive from a person a different compensation (by using a special rate, rebate, drawback, or another means) for a service rendered, or to be rendered, in transportation the carrier may perform under this subtitle than it charges or receives from another person for performing a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances. A common carrier that charges or receives such a different compensation for that service unreasonably discriminates.
 
 
 72
 49 U.S.C.A. § 10741(a) (West Supp.1983) (emphasis added). Dresser and Wyo-Ben claim that by charging more to transport IOP bentonite from the prejudiced points than from Casper, BN unreasonably discriminates against them.
 
 
 73
 Neither petitioners nor respondents dispute that BN is performing a "like and contemporaneous service" in shipping from the prejudiced and preferred points. This is only rational. Where the distance from the prejudiced point to destination is greater than the distance from the preferred point to destination, the difference in the distances could be used to support an argument that like service is not offered at the two points. However, in the reverse situation, where the distance from the preferred point to destination is actually greater than the distance from the prejudiced point to destination, the difference in distances is of no significance whatsoever in determining whether the service from the two points is similar. Where mileage is the only factor taken into account, any excess in mileage from the preferred point to destination over mileage from the prejudiced point to destination merely establishes that service at the two points is at least as similar as would be the service offered a prejudiced and preferred shipper at the same point of origin. See Lindberg, 408 F.Supp. at 1041-42.
 
 
 74
 The only dispute here is over the construction of the phrase "under substantially similar circumstances." A rate difference is not unreasonably discriminatory unless the circumstances affecting the transportation are substantially similar. Nashville, Chicago & St. Louis Ry. v. Tennessee, 262 U.S. 318, 322, 43 S.Ct. 583, 585, 67 L.Ed. 999 (1923). The Commission in Dresser and the Board in Wyo-Ben both found that the real and substantial competition offered BN by CNW at Casper, but not at the prejudiced points of Thermopolis, Greybull or Lovell, constituted a dissimilar circumstance under section 41(a), such that the difference in BN's rates for shipments from the prejudiced points and the preferred point was not unreasonably discriminatory.
 
 
 75
 In L.T. Barringer & Co. v. United States, 319 U.S. 1, 63 S.Ct. 967, 87 L.Ed. 1171 (1943), the Supreme Court stated that:
 
 
 76
 It has long been established by our decisions that differences in competitive conditions may justify a relatively lower line-haul charge over one line than another, and that it is for the Commission, not the courts, to say whether those differences are sufficient to show that a difference in rates established to meet those conditions is not an unjust discrimination or otherwise unlawful.
 
 
 77
 Id. at 971. In Barringer the Court held that the existence of truck competition along one line was a dissimilar circumstance justifying a higher overall rate (through the imposition of a loading charge) on a different line which faced no competition.
 
 
 78
 This rule was extended to include shipments along the same line in the more recent case of A. Lindberg & Sons v. United States, 408 F.Supp. 1032 (W.D.Mich.1976). In Lindberg, the rail carrier charged a higher rate for a short haul clay shipment than for a long haul clay shipment along the same line. Although the Lindberg court found that the threat of rail competition in that case was not supported by substantial evidence, the case nonetheless established the proposition that competitive rail conditions are a legitimate basis for a disparity in transportation rates along the same line, provided the threat of competition is real and substantial. Id. at 1042.
 
 
 79
 The Commission has on numerous occasions considered competition to be a dissimilar circumstance under section 41(a). See, e.g., Huron Portland Cement Co. v. B. & O. Ry. Co., 332 I.C.C. 655 (1968) (threatened construction of competing coal-slurry pipeline was a dissimilar circumstance justifying lower rates); Coal to New York Harbor Area, 311 I.C.C. 355 (1960) (offshore fuel oil pipeline competing with rail transport constitutes a dissimilar circumstance justifying discriminatory rates); Coal from Ky., Va. and W. Va. to Va., 308 I.C.C. 99 (1959) (lower rates justified to meet competitive threat from mine-mouth generating plant). Although none of these cases involved competition from another rail carrier, we find this to be a distinction without a difference. Competition from a competing rail carrier is just as real and substantial, and constitutes just as significant a transportation condition, as competition from a pipeline, a ship, or a truckline.
 
 
 80
 Dresser cites three Supreme Court decisions in support of its argument that a difference in rail carrier competition at two points is not a dissimilar circumstance under section 41(a). See Seaboard Air Line Ry. v. United States, 254 U.S. 57, 62, 41 S.Ct. 24, 25, 65 L.Ed. 129 (1920); Interstate Commerce Commission v. Alabama Midland Ry., 168 U.S. 144, 18 S.Ct. 45, 42 L.Ed. 414 (1897); Wight v. United States, 167 U.S. 512, 17 S.Ct. 822, 42 L.Ed. 258 (1897). The most recent of these cases is over sixty years old, while the oldest was decided in 1897. Since that time, there have been significant changes in the case law, and in ICC policies, which are reflected in the Supreme Court's decision in Barringer, and in the district court's decision in Lindberg.[11] The significant deviation from the principles of Wight, Seaboard and Alabama Midland came in Barringer, where the Court held that truck competition along one line was a dissimilar circumstance justifying a higher overall rate on a different line which faced no competition. It is only one small step from the rule of Barringer to the sub-rule established in Lindberg, and followed in these consolidated cases, that competition from another rail carrier is a dissimilar circumstance as well. Since, as we have already noted, rail competition is as real as truck competition, we see no reason to fault the Commission for its adoption of this rule. As the Supreme Court noted in American Trucking Associations, Inc. v. Atchison, Topeka & Santa Fe Ry., 387 U.S. 397, 87 S.Ct. 1608, 18 L.Ed.2d 847 (1967):
 
 
 81
 ... Regulatory agencies do not establish rules of conduct to last forever; they are supposed, within the limits of the law and of fair and prudent administration, to adapt their rules and practices to the Nation's needs in a volatile, changing economy. They are neither required nor supposed to regulate the present and the future within the inflexible limits of yesterday.
 
 
 82
 Id. at 416, 87 S.Ct. at 1618.
 
 
 83
 The precedents cited by the Commission and the Board adequately support their decision in these proceedings that competition from CNW at Casper was a dissimilar circumstance justifying BN's higher rates at the prejudiced points. Their decisions were neither arbitrary nor capricious. The evidence discussed in our analysis of petitioners' claims under section 26(a)(2) sufficiently establishes that the competition offered by CNW at Casper was real and substantial under section 41(a), as required by Lindberg. We AFFIRM the Commission's and the Board's denial of Dresser and Wyo-Ben's claims under section 41(a).[12]
 
 Conclusion
 
 84
 Concluding that the decisions of the Commission in Dresser and the Board in Wyo-Ben applying sections 26 and 41(a) and (b) are supported by substantial evidence, and are neither arbitrary nor capricious, we AFFIRM.APPENDIX
 
 
 85
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 
 [1]
 CNW's short tariff route has a weight limit of 215,000 lbs./car, while average IOP bentonite shipments weigh 230,000 lbs./car
 
 
 [2]
 C & H Transportation Co. v. ICC, 704 F.2d 834, 840 (5th Cir.1983) citing I.C.C. v. City of Jersey City, 322 U.S. 503, 64 S.Ct. 1129, 1133-34, 88 L.Ed. 1420 (1944)
 
 
 [3]
 For recent applications of this standard in ICC cases decided by this Court, see, e.g., C & H Transportation Co. v. ICC, 704 F.2d 850, 856 (5th Cir.1983); C & H Transportation Co. v. ICC, 704 F.2d 834, 840 (5th Cir.1983); Steere Tank Lines v. ICC, 703 F.2d 927, 929 (5th Cir.1983); Steere Tank Lines v. ICC, 694 F.2d 413, 418 (5th Cir.1982); Western Coal Traffic League v. United States, 694 F.2d 378, 383 (5th Cir.1982); Steere Tank Lines v. ICC, 687 F.2d 104, 105 (5th Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 1430, 75 L.Ed.2d 790 (1983); J.H. Rose Truck Line v. ICC, 683 F.2d 943, 948 (5th Cir.1982); Alamo Express, Inc. v. ICC, 673 F.2d 852, 856 (5th Cir.1982); Mississippi Public Service Commission v. ICC, 650 F.2d 551, 553 (5th Cir.1981); State of Texas v. United States, 642 F.2d 87, 89-90 (5th Cir.1981); Watkins Motor Lines v. ICC, 641 F.2d 1183, 1188 (5th Cir.1981); Central Power & Light Co. v. United States, 634 F.2d 137, 149-50 (5th Cir.1980), cert. denied sub nom., 454 U.S. 831, 102 S.Ct. 128, 70 L.Ed.2d 108 (1981). See also A. Lindberg & Sons v. United States, 408 F.Supp. 1032 (W.D.Mich.1976), in which the district court applied this standard in reviewing a Commission decision based upon sections 26(a)(2) and 41(a), (b)
 
 
 [4]
 In reviewing the Commission's abandonment of a "common control" rule for an "actual control" standard for evaluating unreasonable discrimination by a carrier under section 41(b), we said in Nueces:
 The scope of our review of Interstate Commerce Commission action is reiterated in Missouri-Kansas-Texas Railroad Company v. United States, 632 F.2d 392 (5th Cir.1980), cert. denied, 451 U.S. 1017, 101 S.Ct. 3004, 69 L.Ed.2d 388 (1981), which involved, in part, the Commission's adoption of a different standard for determining whether a railway merger is "consistent with public interest." We stated: "We can ask only whether the Commission has observed the statutory limits that Congress has set for its discretion, whether its action was arbitrary or capricious, or whether its findings are supported by adequate analysis and substantial evidence in the record as a whole." Id. at 400.
 Nueces, 674 F.2d at 1062.
 
 
 [5]
 See, e.g., C & H Transportation Co. v. ICC, 704 F.2d 834, 841 (5th Cir.1983); Steere Tank Lines v. ICC, 703 F.2d 927, 929 (5th Cir.1983); Steere Tank Lines v. ICC, 687 F.2d 104, 105 (5th Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 1430, 75 L.Ed.2d 790 (1983); J.H. Rose Truck Line v. ICC, 683 F.2d 952, 956 (5th Cir.1982); Trailways, Inc. v. ICC, 681 F.2d 252, 254 (5th Cir.1982); Alamo Express, Inc. v. ICC, 673 F.2d 852, 856 (5th Cir.1982); Central Power & Light Co. v. United States, 634 F.2d 137, 149 (5th Cir.1980), cert. denied, sub nom., 454 U.S. 831, 102 S.Ct. 128, 70 L.Ed.2d 108 (1981), for the most recent cases
 
 
 [6]
 C & H Transportation Co. v. ICC, 704 F.2d 834, 841 (5th Cir.1983)
 
 
 [7]
 See, e.g., C & H Transportation Co. v. ICC, 704 F.2d 834, 841 (5th Cir.1983); Steere Tank Lines v. ICC, 703 F.2d 927, 929 (5th Cir.1983); Steere Tank Lines v. ICC, 687 F.2d 104, 105 (5th Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 1430, 75 L.Ed.2d 790 (1983); J.H. Rose Truck Line v. ICC, 683 F.2d 943, 948 (5th Cir.1982); Nueces County Navigation District No. 1 v. ICC, 674 F.2d 1055, 1062 (5th Cir.), cert. denied, --- U.S. ----, 103 S.Ct. 446, 74 L.Ed.2d 601 (1982); Alamo Express, Inc. v. ICC, 673 F.2d 852, 856 (1982); Watkins Motor Lines v. ICC, 641 F.2d 1183, 1188 (5th Cir.1981); Refrigerated Transport Co. v. ICC, 616 F.2d 748, 751 (5th Cir.1980). See also Pierce & Shapiro, Political and Judicial Review of Agency Action, 59 Texas L.Rev. 1175, 1183-86, for a recent analysis of how courts reviewing agency action actually apply this standard
 
 
 [8]
 See, e.g., Steere Tank Lines v. ICC, 703 F.2d 927, 929 (5th Cir.1983); J.H. Rose Truck Line v. ICC, 683 F.2d 943, 947 (5th Cir.1982); Nueces County Navigation District No. 1 v. ICC, 674 F.2d 1055, 1063 (5th Cir.), cert. denied, --- U.S. ----, 103 S.Ct. 446, 74 L.Ed.2d 601 (1982); Central Freight Lines v. United States, 669 F.2d 1063, 1074 (5th Cir.1982); Watkins Motor Lines v. ICC, 641 F.2d 1183, 1185 (5th Cir.1981)
 
 
 [9]
 Although CBQ established the Casper rate in 1965 and CNW filed a comparable rate shortly thereafter, it does not follow that either CBQ or its successor BN has controlled the Casper rate since that time. Competing relations among carriers are fluid, and must adjust to changing business and regulatory environments
 
 
 [10]
 "Unreasonable discrimination will not be found in the absence of actual common control, nor where a rate disparity is justified by any relevant difference in transportation conditions." Samuels, 364 I.C.C. at 283 (emphasis added)
 
 
 [11]
 See also National Gypsum Co. v. United States, 353 F.Supp. 941 (W.D.N.Y.1973); Harvest House Marketing Corp. v. Green Bay & W., 358 I.C.C. 531 (1978) for cases in which competition was considered a dissimilar circumstance
 
 
 [12]
 In denying Dresser's section 41(a) claim, the Commission also cited language from the Committee Report accompanying the Staggers Rail Act of 1980, 94 Stat. 1895 (partially amending section 41), to the effect that "the conferees ... expect the Commission to exercise its remaining power under section 10741 only where it is needed to prevent abuses of market power where discrimination cannot be justified by differences in demand for services or costs." H.R.Rep. No. 96-1430, 96th Cong. 2d Sess. 104 (1980), U.S.Code Cong. & Admin.News 1980, pp. 3978, 4136. Since the Commission's decision is adequately supported by pre-Staggers Act Law, we need not consider the effect of the Staggers Act, if any, on subsequent applications of section 41(a) or (b)